THE TOWN OF CICERO, Plaintiff-Appellee, v. ILLINOIS ASSOCIATION OF FIREFIGHTERS, IAFF LOCAL 717, AFL-CIO, CLC, Defendant-Appellant.

First District (1st Division) No. 1—01—3931

Opinion filed March 31, 2003.

J. Dale Berry and Richard J. Tupper, both of Cornfield & Feldman, of Chicago, for appellant.

Dennis E. Both, of Edward R. Vrydolyak, Ltd., of Chicago, for appellee.

JUSTICE SMITH delivered the opinion of the court:
Defendant, Illinois Association of Firefighters, IAFF Local 717, AFL-CIO, CLC (Union), appeals from an order of the circuit court of Cook County that vacated and remanded an arbitral award in the Union's favor. The Union contends that the trial court erred in finding the arbitrator's award to have been arbitrary and capricious and in excess of his authority, and that the scope of the trial court's review was impermissibly broad.

## BACKGROUND

The Union is the exclusive bargaining representative of all firefighters employed by plaintiff, the Town of Cicero (Town). In the course of collective bargaining between the Union and the Town over the terms of the Union's 1997 employment agreement, the parties reached an impasse with respect to the Union's proposal to eliminate the Town's residency requirement.

The preceding collective bargaining agreement between the parties contained the following language with respect to residency:

"The Town of Cicero reserves the right to adopt a residency rule for employees covered under this collective bargaining agreement provided that no such rule, if adopted[,] shall be enforced unless it is uniformly applied to all employees and officers of the Town.
***
The Town of Cicero reserves its right not to submit the issue residency to arbitration pursuant to [the predecessor section to section 14 of the Illinois Public Labor Relations Act]. Attached to this agreement is a copy of the Residency Ordinance for the Town of Cicero."

The Town's residency ordinance, in place since 1979, provides in pertinent part that:

"Sec. 2—123. Residency requirement.
(a) All persons accepting appointment or employment with the town as officers, officials or employees, certified or noncertified, must make their residence and maintain their domicile within the Town of Cicero no later than six months after commencing their employment and keep such domicile during the term of the appointment or employment.

\*\*\*

(c) Failure \*\*\* to comply with the residency and domicile requirements will be sufficient cause for termination of employment or removal from service in a manner prescribed by law." Cicero Municipal Code § 2—123 (amended March 29, 1988).

The Union had initially proposed that firefighters be required only to reside in Illinois. The Town in turn proposed that residency within Cicero's municipal boundaries remain the status quo. Hence, the impasse.

■ Firefighters are classified under the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq* (West 1996)) (Act) as persons performing "essential services," and, in consideration of the health and safety of the general public, the Act prohibits them from conducting labor strikes as a means of resolving labor disputes. See 5 ILCS 315/17, 14(m) (West 1996). As an alternative, section 2 of the Act provides:

"To prevent labor strife and to protect public health and the safety of the citizens of Illinois, all collective bargaining disputes involving persons designated by the Board as performing essential services \*\*\* shall be submitted to impartial arbitrators, who shall be authorized to issue awards in order to resolve such disputes." 5 ILCS 315/2 (West 1996).

■ In 1997, the Illinois legislature amended section 14(i) of the Act and removed the former blanket prohibition on bargaining over residency, for peace officers in municipalities with a population less than 1 million. The amended section 14(i) provides in relevant part as follows:

"In the case of peace officers, the arbitration decision shall be limited to wages, hours, and conditions of employment (which may include residency requirements in municipalities with a population under 1,000,000, but those residency requirements shall not allow residency outside of Illinois) and shall not include the following: i) residency requirements in municipalities with a population of at least 1,000,000." 5 ILCS 315/14(i) (West 1998).

The Union accordingly invoked its right to arbitration over the residency issue. The parties waived their rights under section 14(b) of the Act to a tripartite panel (consisting of one delegate selected by each party and a neutral arbitrator) and elected to submit the dispute solely to arbitrator Herbert Berman for resolution. The parties stipulated that the issue before arbitrator Berman was "Whether Article 20, Section 20.1 of the (collective bargaining agreement) shall be amended by the Union's proposal." The Union's last proposal, modified from its original offer to limit residency to within Illinois state lines, was:

"Effective upon the issuance of the Arbitrator's Award, Section

20.1 of the collective bargaining agreement shall be modified as follows:

> All bargaining unit employees shall reside within the geographical area bounded by: Illinois Route 39 on the West; Interstate 80 on the South; Illinois Route 22 on the North and Lake Michigan on the East."

Arbitrator Berman conducted full evidentiary hearings on September 2, 9 and 11, and December 8, 9 and 10, 1998. Both parties then submitted posthearing briefs. On November 26, 1999, arbitrator Berman issued his opinion and award, in which he adopted the Union's last proposal.

Subsequently, pursuant to section 14(n) of the Act, the Town by a three-fifths majority timely voted to reject the arbitration award, and the parties returned for a supplemental proceeding pursuant to section 14(o) of the Act. Following the supplemental hearing, additional briefs were submitted by the parties, and on September 12, 2000, arbitrator Berman issued his supplemental opinion and decision. Therein, he reaffirmed his original decision to adopt the Union's proposal with respect to residency.

On December 26, 2000, the Town filed a petition for review in the circuit court pursuant to section 14(k) of the Act, asking that the court vacate the arbitrator's opinion and award.[1] The Town contended that the arbitrator's decision was arbitrary and capricious and/or in excess of his statutory authority in the following respects: he improperly acted as a super town board; he failed to adhere to statutory guidelines; he relied on a factor that the legislature did not intend for him to consider; he failed to consider or give weight to the analyses of the Town's expert witnesses; he made invalid assumptions not supported by the evidence presented at the hearings; he failed to adhere to settled arbitral law; he lacked jurisdiction; and finally, the Act is unconstitutional because it violates the single subject rule and constitutes special legislation.

The Union in turn filed a motion for summary judgment to affirm the award. The Town's petition was answered and the Union's motion was fully briefed, after which the court elected, *sua sponte*, to disregard the summary judgment format and to decide on the merits the issues presented by the parties. On October 5, 2001, the court issued a memorandum opinion and order in which it reversed the arbitrator's award and remanded the cause for another proceeding. Purportedly acting within the guidelines set forth in section 14(k) of the Act, the court found the arbitral award to have been arbitrary and capricious

---

[1]On March 8, 2001, the circuit court granted the Town's motion to stay the effect of the arbitrator's award.

and in excess of the arbitrator's authority. Specifically, the court determined that the arbitrator had failed to give adequate weight to statutory factors related to comparability and the public welfare contained in section 14(h) of the Act and that his application of those factors was otherwise arbitrary and capricious. Further, he relied on a factor not enumerated by the legislature in reaching his decision, *i.e.*, the liberty interests of the firefighters, and thereby exceeded his authority.

On appeal, the Union contends that the trial court improperly substituted its judgment for that of the arbitrator, misapplied the arbitrary and capricious standard of review, and repeatedly misstated the arbitrator's reasoning. The Union additionally argues that the sections of the Act at issue are constitutional and that the arbitrator had jurisdiction to decide the residency requirement dispute.

## DISCUSSION

### Jurisdiction

The Town argued before the arbitrator and continues to suggest on appeal that residency requirements are not a mandatory subject of collective bargaining and, thus, the arbitrator lacked jurisdiction over this dispute. Specifically, the Town's position is that only "mandatory" subjects of collective bargaining are subject to resolution by interest arbitration and that section 14 of the Act leaves the arbitrability of residency disputes open to a case-by-case determination, in light of the balancing test set forth in *Central City Education Ass'n, IEA/NEA v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 599 N.E.2d 892 (1992), and *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 692 N.E.2d 295 (1998).

■ Whether a topic is a mandatory subject of bargaining is, as the Town argues, *generally* determined according to the *Central City/Belvidere* balancing test. Pursuant to the test, a matter is a mandatory subject of bargaining (1) if it concerns wages, hours and terms and conditions of employment and (2) is either not a matter of inherent managerial authority or is a matter of inherent managerial authority, but the benefits of the bargaining outweigh the burdens bargaining imposes on the employer's authority.

In this case, section 14 of the Act *specifically determines* the negotiability of certain subjects of bargaining for firefighter and peace officer bargaining units. Prior to 1997, section 14(i) of the Act explicitly provided that residency requirements were not mandatory subjects of bargaining for peace officer bargaining units. The language in that section read as follows:

"In the case of peace officers, the arbitration decision shall be

limited to wages, hours and conditions of employment and shall not include the following: i) *residency requirements*; ii) the type of equipment, other than uniforms issued or used; iii) manning ***." (Emphasis added.) 5 ILCS 315/14(i) (West 1996).

In 1997, section 14(i) was amended to read:

"In the case of peace officers, the arbitration decision shall be limited to wages, hours, and conditions of employment (*which may include residency requirements in municipalities with a population under 1,000,000 ***." (Emphasis added.) 5 ILCS 315/14(i) (West 1998).

■ Even if the language of the Act is interpreted to be permissive and not necessarily mandatory, and the *Central City/Belvidere* test were applicable, we find that each of its prongs weighs in favor of mandatory arbitrability of a residency requirement dispute. As to prong one, the Town's residency ordinance states that those not in compliance may be terminated. It is therefore quite clear that the Town considers and treats residency as a term and condition of employment. As to prong two, the Town is hard-pressed to explain just how a residency requirement concerns a matter of inherent managerial policy. Essentially, the Town says that it does and fails to say more. If, for example, the Town could argue that firefighters living in Town was essential to prompt responses to emergency situations, then it might have a viable argument under this prong. No such argument is advanced, however. Even if residency requirements did touch on a matter of inherent managerial authority, prong three requires that the benefits of bargaining for Union members be weighed against its burdens to the Town.

The Union members have a significant interest in their choice of residency, whereas the Town has not explained why bargaining over this issue would be an impermissible burden upon its authority. On balance, we determine that the arbitrator had jurisdiction to decide this dispute.

## Standard of Review

■ The standard of review in this case is highly deferential. The object of arbitration is to avoid the formalities, delay and expenses of litigation in court (*Seither & Cherry Co. v. Illinois Bank Building Corp.*, 95 Ill. App. 3d 191, 195, 419 N.E.2d 940 (1981)), and limited judicial review fosters the long-accepted and encouraged principle that an arbitration award should be the end, not the beginning, of litigation (*Garver v. Ferguson*, 76 Ill. 2d 1, 9, 389 N.E.2d 1181 (1979)). As the Supreme Court has stated:

"Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of

settling disputes, it should receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact. A contrary course would be a substitution of the judgment of the chancellor in place of the judges chosen by the parties ***." *Burchell v. Marsh*, 58 U.S. (17 How.) 344, 349, 15 L. Ed. 96, 99 (1855).

Thus, whenever possible, a court must construe an award so as to uphold its validity. *Garver*, 76 Ill. 2d at 10, 389 N.E.2d 1181.

■ Further, in determining whether grounds exist to vacate an arbitration award, judicial review generally extends only to those areas expressly stated by statute. *Edward Electric Co. v. Automation, Inc.*, 229 Ill. App. 3d 89, 97, 593 N.E.2d 833 (1992). Section 2 of the Act provides:

"It is the public policy of the State of Illinois that where the right of employees to strike is prohibited by law, it is necessary to afford an alternate, expeditious, equitable and effective procedure for the resolution of labor disputes subject to approval procedures mandated by this Act. To that end, the provisions for such awards shall be liberally construed." 5 ILCS 315/2 (West 1996).

This provision is amplified and made explicit in section 14(k), which states:

"Orders of the arbitration panel shall be reviewable, upon appropriate petition by either the public employer or the exclusive bargaining representative, by the circuit court for the county in which the dispute arose or in which a majority of the affected employees reside, but only for reasons that the arbitration panel was without or exceeded its statutory authority; the order is arbitrary, or capricious; or the order was procured by fraud, collusion or other similar and unlawful means." 5 ILCS 315/14(k) (West 1996).

■ Though recognizing the difficulty of enumerating all of the kinds of acts or omissions that will constitute arbitrary and capricious conduct, our supreme court has held that agency action is arbitrary and capricious if the agency: (1) relies on factors that the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision that runs counter to the evidence before the agency or that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 505-06, 524 N.E.2d 561 (1988). The standard is one of rationality. *Greer*, 122 Ill. 2d at 506.

■ Section 14(h) of the Act lists eight factors to be considered by

the arbitrator "as applicable" in interest arbitration.[2] Those factors are:

"(1) The lawful authority of the employer.

(2) Stipulations of the parties.

(3) The interests and welfare of the public and the financial ability of the unit of government to meet those costs.

(4) Comparison of the wages, hours and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours and conditions of employment of other employees performing similar services and with other employees generally:

A. In public employment in comparable communities.

B. In private employment in comparable communities.

(5) The average consumer prices for goods and services, commonly known as the cost of living.

(6) The overall compensation presently received by the employees, including direct wage compensation, vacations, holidays and other excused time, insurance and pensions, medical and hospitalization benefits, the continuity and stability of employment and all other benefits received.

(7) Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings.

(8) Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, fact-finding, arbitration

---

[2]For the sake of clarity, it should be emphasized that the parties below engaged in interest, as opposed to grievance, arbitration. The difference is that, in grievance arbitration, the arbitrator is called upon to resolve a dispute as to the meaning of or the parties' compliance with an existing contract. A court determines, on review of such an award, whether the award can be said to have drawn its essence from the contract under interpretation. In contrast, in interest arbitration, the parties have yet to agree upon the terms of a contract. It is therefore the task of the arbitrator to formulate contractual language that would best reflect what the parties themselves would agree to, had an impasse not occurred. A court determines, on review of such an award, whether the arbitrator has applied the appropriate criteria (the section 14(h) factors) to his findings.

In economic interest arbitration (*e.g.*, a wage increase proposal), the arbitrator is obliged to select one or the other of the parties' final offers as the ultimate contractual language. In noneconomic interest arbitration (such as a proposal to abolish a residency requirement), the arbitrator may either select the final offer of a party or he may formulate a unique offer, building on the two advanced.

or otherwise between the parties, in the public service or in private employment." 5 ILCS 315/14(h) (West 1996).

## Reliance on Factors the Legislature Did Not Intend[3]

■ The Town argues that the arbitrator improperly created and then placed a premium on the factor of the firefighters' "liberty interests." Nowhere, the Town insists, are liberty interests among the factors enumerated by the legislature for consideration in section 14(h).

Factor (h)(8) is broadly worded and in our view is, as the trial court described it, a "catchall." The language it contains was most likely intended by the legislature to be flexible and adaptable, so that a wide variety of disputes and concerns could be addressed by section 14 without necessitating that the legislature anticipate precisely what those concerns might be. Were it otherwise, there might be dozens of enumerated factors and still a situation that was not specifically envisioned at the time of drafting might arise.

The Town cannot credibly argue that a residency requirement does not implicate and limit certain liberties on the part of employees subject thereto. Such employees lose, for example, the freedom to choose where to buy a home, to raise a family and to send one's children to school. The Union stressed the importance of these freedoms repeatedly throughout the proceedings, and it was well within the discretion of the arbitrator to consider those arguments as part of what interests were to be balanced. That the Town does not like or agree with the manner in which the balance was struck in this case does not lead to the conclusion that the reasoning employed by arbitrator Berman was irrational. *Greer*, 122 Ill. 2d at 506.

## Failure to Consider Mandatory Factors

Both the Town and the circuit court identified as a major flaw in the arbitrator's analysis his selection of comparable communities under statutory factor (h)(4). At the hearing, both sides presented arguments and evidence with respect to which communities ought to be selected as comparable for purposes of determining whether to abolish or maintain the Town's residency requirement as to the firefighters. The Town presented the testimony of Dr. Cedric Herring, a professor of sociology and public policy at the University of Illinois.

---

[3]The Town has couched this issue in terms of the arbitrator having exceeded his authority. The Union argues that it is more properly subject to arbitrary and capricious analysis. Either way, because we conclude that the factor of liberty interests is not *dehors* the statute, the arbitrator's authority was not exceeded.

Dr. Herring testified that in his opinion, the only truly comparable communities to Cicero were those within what he described as the "inner ring" of the Chicago Metropolitan area. Dr. Herring explained that these communities, which include Maywood, Harvey, and Melrose Park (among others) are similar economically, racially and socially to Cicero, and thus are likely to have the same reasons for wanting their municipal employees to be residents. The Union, without presenting an expert, suggested as comparable communities those that are geographically proximate and of similar populations. The Union explained that these are the communities within the labor market with which the Town competes for its firefighters.

The arbitrator spent the bulk of his opinion on the comparability analysis. He reasoned that he was not entirely satisfied with either of the suggestions advanced. With respect to the Town's position, he stated that while he accepted the validity of working with inner ring towns, he found Dr. Herring's selection of specific towns within that subset to be unsound. He explained that while certain of the inner ring towns with residency requirements had been selected, many others, with no residency requirement, had not been. According to the arbitrator, Dr. Herring failed to provide a satisfactory explanation as to why the towns he presented for comparison were *uniquely* comparable to Cicero.

As to the Union's position, the arbitrator found that geographic proximity was a criterion that could not be biased one way or the other in terms of whether residency requirements are the norm. Ultimately, the arbitrator took all of the evidence submitted into consideration, and his selection of comparable towns included Arlington Heights, Buffalo Grove, Glenview, Hoffman Estates and Palatine (among others).

● ■ Preliminarily, we note that the Town's argument that the arbitrator was bound to accept its position because it was supported by the testimony of an expert whereas the Union's was not is unavailing. It is well settled that a fact finder is not bound to accept noncredible testimony, or testimony without sufficient foundation, simply because it is uncontroverted. *Sorensen v. Industrial Comm'n*, 281 Ill. App. 3d 373, 382-84, 666 N.E.2d 713 (1996).

■ It bears repeating that the standard of review is neither the rigorous *de novo* nor the still searching manifest weight of the evidence; rather, it is *arbitrary and capricious*. Under this standard, this court could conclude that if Cicero competes with other communities in the Chicago metro area, including Arlington Heights, etc. for firefighters, then it was reasonable for the arbitrator to have considered whether those communities imposed on their firefighters residency requirements.

█ The arbitrator's opinion reveals that he was very much aware of the reasons for which the Town wished to maintain its requirement. Indeed, the issue is not, stripped of hyperbole, whether the Arbitrator *ignored* statutory factors, evidence or arguments, but whether he reached the correct conclusion in his consideration of same. That this court or the circuit court might have decided the issue differently does not make the arbitrator's decision arbitrary or capricious. *Church v. State*, 251 Ill. App. 3d 942, 947-48, 623 N.E.2d 936 (1993).

█ The Town also argues under this rubric that the arbitrator failed to give adequate consideration to internal comparability, that is, how the issue of a residency requirement for the firefighters might impact other Town employees.[4] The Town points out that its residency requirement is not unique to its firefighters, but extends to all of its municipal workers. If the residency requirement were to be lifted or modified as to the firefighters, it is inevitable that other employees would clamor for equal treatment.[5] Taken to its logical conclusion, this scenario could result in a mass exodus of Town employees, to the detriment of the Town.

On this subject, the Town offered the testimony and summary report of Dr. Joseph Persky, a professor of economics at the University of Illinois, Chicago. Dr. Persky estimated that if the Town's employees fled, the Town would be left with a higher per capita cost of services and lower overall housing values, among other problems. Further, the Town would have to increase taxes to provide the same services or else decrease local services, such as streets and sanitation, because of fewer resources.

The Union in turn pointed out that Cicero has a "population density that is more than 186% higher than the density for all comparable municipalities," and 340.1% higher than the average density "[a]mong municipalities with city limit residency." And that "[w]ithin Cicero's city limits, the supply of acceptable housing is limited"; Cicero firefighters "consider Cicero's schools unacceptable" and see personal safety and gang crime as "primary considerations."

The arbitrator viewed his task as one of balancing the competing interests of the Union members to live where they and their families would prosper and those of the Town, which he found was legitimately concerned with continued "white flight" and decreasing coffers. The

---

[4]According to the record, the Town has approximately 500 town employees, including 76 firefighters.

[5]Indeed, the Cicero police have a "me too" clause in their collective bargaining agreement as to this issue and others.

arbitrator's opinion reflects that he both understood and gave consideration to Dr. Persky's warnings. He noted, however, that Dr. Persky's study was predictive; it was forecast upon particular assumptions and entirely hypothetical in the sense that there was no town to which Dr. Persky or the Town could point and say *that's* what happens when a residency requirement is abolished. Whereas, the arbitrator reasoned, the impact of the residency requirement on the Union was immediate and definite. The arbitrator concluded that the 67 firefighters represented by the Union could not properly be made to shoulder the socioeconomic well-being of a town of 67,000, particularly in light of the speculative nature of what consequences would result from the modification to the residency requirement. We decline to find this arbitrary or capricious.

 Finally under this topic, the Town argues that the arbitrator afforded no weight at all to factor (h)(3), specifically, to the "welfare and interest of the public." 5 ILCS 315/14(h)(3) (West 1996). The only evidence offered on this issue were the results of two Town referenda, in which the citizenry purportedly voted not to do away with the residency requirement for firefighters. Those referenda were not made part of the record on appeal, but the Town is correct in its assessment that the Arbitrator gave them little weight.

Most likely, factor (h)(3) is more meaningfully considered in arbitration involving purely economic disputes than on an issue such as a residency requirement. Indeed, the second clause in this factor is "and the financial ability of the unit of government to meet those costs." 5 ILCS 315/14(h)(3) (West 1996). The Town has never argued that it could not meet any particular costs, and thus the latter part of the clause is not relevant to the instant dispute. As to the first clause, the arbitrator *did* consider the welfare of the public in terms of safety and concluded that this would not be compromised if the firefighters were allowed to reside outside Town limits, in light of the battalion system and mutual aid pacts among the Town and cooperating fire protection districts.

### Constitutionality

The Town raises two challenges to the constitutionality of the Act. The arbitrator declined to rule on these challenges, deeming them the province of a court of law. The trial court did not reach them. The Town first argues that section 14 of the Act violates article IV, section 8(d), of the Illinois Constitution of 1970, which requires that legislation be confined to one subject.

Specifically, the Town contends that Public Act 90—385 (Pub. Act 90—385, eff. August 15, 1997), which contains language mandating

interest arbitration of residency disputes for both police and fire employees is invalid, because it was enacted in conjunction with other disparate matters, related to animal control and diseased animals. Accordingly, the interest arbitration award should be vacated on the grounds of constitutional infirmity. The Union responds that we need not address the constitutionality of Public Act 90—385, because Public Act 90—202 (Pub. Act 90—202, eff. July 24, 1997), enacted prior thereto, already provided for mandatory interest arbitration of disputes over residency for firefighters in its amendment of section 14(i).[6]

Because section 14(i) already provided for interest arbitration with respect to residency for firefighters (which is precisely what occurred below), this court need not concern itself with whether subsequent amendments to that section, which left intact the clause on which the arbitration in this case was based, were constitutional. See *Village of Schaumburg v. Franberg*, 99 Ill. App. 3d 1, 9, 424 N.E.2d 1239 (1981) (this court should not unnecessarily address constitutional issues).

The Town's second constitutional challenge to the Act and thus the arbitral award is based on the exemption in section 14(i) from mandatory arbitration over residency disputes for "municipalities with a population of at least 1,000,000." 5 ILCS 315/14(i) (West 1996). The Town contends that such an exemption constitutes special legislation in violation of article IV, section 13.

In determining whether legislation violates the special legislation prohibition of the Illinois Constitution, the controlling question is whether the statutory classification is rationally related to a legitimate state interest. *Nevitt v. Langfelder*, 157 Ill. 2d 116, 125-26, 623 N.E.2d 281 (1993). We may strike down section 14(i)'s distinction based upon population size "[o]nly if it can be said that the classification is clearly unreasonable and palpably arbitrary." *Nevitt*, 157 Ill. 2d at 130. Because in our judgment there are rational bases for the different population classifications in section 14(i), we do not find the distinction in question to be constitutionally infirm.

## CONCLUSION

We find the decision of the arbitrator to have been reasoned and based on the applicable statutory factors for the resolution of this residency requirement dispute. We accordingly reverse the circuit

---

[6]The Town does not argue that Public Act 90—202 is invalid.

court's finding to the contrary and affirm the arbitral opinion and award.

Circuit court reversed; arbitral award affirmed.

GORDON, P.J., and O'MALLEY, J., concur.