2025 IL App (1st) 240220

Nos. 1-24-0220, 1-24-0322, 1-24-0945, 1-24-0951 (Cons.)

Opinion filed March 31, 2025

FIRST DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| CYNTHIA KROFT and MARK KROFT, | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | Appeal from the |
| | ) | Circuit Court of |
| v. | ) | Cook County |
| | ) | |
| VIPER TRANS, INC., an Illinois Corporation; PR | ) | No. 16 L 9466 |
| RENTAL, INC., an Illinois Corporation; and PREDRAG | ) | |
| RADISAVLJEVIC, an Illinois Resident, Individually and | ) | The Honorable |
| as Employee, Agent and/or Servant of Viper Trans, Inc., | ) | Joan E. Powell, |
| and PR Rental, Inc., | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellants. | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion.
Justice Pucinski also specially concurred, with opinion.

**OPINION**

¶ 1    The defendants, Viper Trans, Inc., PR Rental, Inc., and Predrag Radisavljevic, appeal the trial court's denial of their posttrial motions whereby they sought a new trial following a jury verdict in favor of the plaintiffs, Cynthia Kroft and Mark Kroft, on their respective claims for personal injury and loss of consortium arising from a motor vehicle collision. The defendants' primary argument on appeal is that they were deprived of a fair trial by the plaintiffs' attorneys publishing

of social media posts during trial titled "What Jurors Should Know But Don't," in which the plaintiffs' attorneys discussed the present case and various other matters about which they claimed the jury was being improperly "kept in the dark." We agree that a serious effort toward reaching the jury and influencing its verdict occurred in this case. We further conclude that the trial court abused its discretion in the manner by which it investigated whether these social media posts had come to the attention of any juror, by questioning the jury as a group and making highly suggestive statements that may have primed the jurors away from being publicly forthcoming about whether the posts had in fact come to their attention. For these reasons, we vacate the jury's verdict and remand this case for a new trial.

¶ 2                                    I. BACKGROUND

¶ 3        On May 11, 2016, plaintiff Cynthia (Cindy) Kroft was catastrophically injured in a rear-end collision with a tractor-trailer. Defendant Radisavljevic was the driver of the tractor trailer, which was owned by his company, defendant PR Rental, and leased at the time to defendant Viper Trans. The defendants do not dispute that they were negligent in causing the rear-end collision, nor do they dispute the injuries that the plaintiff suffered as a result of the collision. A claim for loss of consortium is also pursued by plaintiff Mark Kroft.

¶ 4        This case has been the subject of two trials in which the only issue in dispute was the amount of the plaintiffs' compensatory damages. With one exception noted below, the trial testimony itself is largely not pertinent to the issues presented in this appeal. The jury heard the testimony of both plaintiffs and 13 damages witnesses at the second trial. We summarize that their testimony established that prior to the collision, the plaintiff was a healthy 53-year-old woman who enjoyed working as an ICU nurse; spending time with her husband, family, and friends; and engaging in a variety of physical activities such as running and swimming. Her life changed dramatically and

permanently as a result of the collision, in which she suffered a fractured cervical vertebrae and spinal cord injury, which rendered her an incomplete quadriplegic. In the year following the collision, she underwent three spine surgeries. She is now severely limited in the use of her extremities, with almost no function in her left hand. She suffers from spasticity and a loss of motor control and sensation in all extremities. She can walk short distances, but she has a foot drop that causes problems with gait. She uses a cane when walking outside. She has autonomic dysfunction, which causes lightheadedness, difficulties regulating body temperature, and heart palpitations. She has neurogenic bowel and bladder, which causes her to experience significant difficulties involving urination and defecation and requires an extensive daily bowel program. The blunt trauma to her neck also resulted in right vocal cord paralysis, which in turn places her at risk of aspiration. She experiences chronic neuropathic pain, cervicogenic headaches, and difficulty holding her head upright for more than about 30 minutes. She has completed over 500 hours of physical, occupational, and speech therapy, and she has undergone over 40 invasive medical procedures. Her stipulated past medical bills totaled $1,191,835.87.

¶ 5        As a result of her injuries, the plaintiff is no longer able to work. The plaintiff presented evidence through an economist of lost earning capacity of between $1.3 million to $2 million. She is always at great risk for falling. She has great difficulty with any activity involving the use of her upper extremities, such as dressing herself. She is capable only of minimal levels of cooking or housekeeping, and she is heavily reliant on her husband for assistance with these and other tasks. At trial, the primary issue of dispute was the extent of the plaintiff's recovery in the years since the collision and her need for future medical care. For example, the defendants emphasized her continued ability to drive and to pass the tests required to do so. The plaintiffs presented expert testimony of a future life-care plan valued at $9.4 million, while the life-care plan presented by the

defendants was valued by their experts at $1.83 million.

¶ 6        Relevant to this appeal, the plaintiff demonstrated worsening symptoms after the first trial that led to the discovery in 2022 that she had developed a "syrinx." This syrinx had not been diagnosed at the time of the first trial, and thus it was not discussed. According to the testimony at the second trial by her neurologist, Richard Cristea, M.D., a posttraumatic syrinx is a hole that develops in the center of the spinal cord following a trauma, which fills with spinal fluid and can grow progressively. As it grows, it expands into the spinal cord tissue, which causes progressively increased neuropathic pain, weakness, spasticity, and other neurologic symptoms, and it can eventually lead to paralysis if left untreated. Its growth requires frequent MRI monitoring. Surgical intervention through a duraplasty or catheter placement is necessary to stop progressive neurological worsening. These surgical treatments have only about a 50% success rate and involve a high risk of complications. Dr. Cristea also testified at the second trial only that the plaintiff has experienced atrophy of her brain and cognitive impairment due to the traumatic injuries she experienced in the collision.

¶ 7        The first jury trial of this case took place beginning May 10, 2021. Following a four-day trial, the jury returned a verdict of slightly over $43 million in total between the two plaintiffs.

¶ 8        On July 19, 2021, the defendants jointly filed a posttrial motion for a new trial. They argued that plaintiffs' counsel had repeatedly violated various rulings on motions *in limine* throughout the trial and had engaged in improper *ad hominem* attacks against the defendants and their attorneys. They also argued that plaintiffs' counsel had repeatedly referred to damage to the plaintiff's brain despite the trial court's order barring reference to brain injury due to the plaintiffs' attorneys' failure to disclose medical testimony on this topic.

¶ 9        On November 29, 2022, the trial court granted the defendants' motion and ordered a new

trial. In doing so, the trial court stated that despite it being an admitted-liability trial in which the court had granted a motion *in limine* barring evidence about the facts of the collision, plaintiffs' counsel had repeatedly "continued to try to introduce evidence that had nothing to do with damages." The court also cited the fact that plaintiffs' counsel had referred to the defendants' attorneys in argument as "hypocrites" and "two-faced" and asserted that the defendants were refusing to take responsibility. The court further stated that plaintiffs' counsel "continued to talk about brain injuries" even though no evidence of brain injury had been disclosed. The trial court stated that the comments by the plaintiffs' attorney "were premeditated and were intended to get more money *** by bringing up alleged issues that were not issues in the case and certainly not relevant to the issues in the case." No appeal was taken from this order granting a new trial.

¶ 10    The case was eventually reassigned to a different trial judge for a new trial to commence on July 5, 2023. Jury selection began on July 6, 2023, and continued through the morning of July 7, 2023. During that process, several potential jurors mentioned that they recognized the plaintiffs' attorney, Kenneth J. Allen, from his commercials on television. Jury selection concluded on July 7, 2023, and the case proceeded to opening statements and the presentation of several witnesses that day. After the jury was empaneled and prior to opening statements, the trial court read the general cautionary instruction to the jury. See Illinois Pattern Jury Instructions, Civil, No. 1.01(A) (rev. Feb. 2023). In pertinent part, that instruction cautioned the jurors not to "do any independent investigation or research on any subject relating to the case." Specifically, the trial court instructed them to "not use the Internet, including Google, ChatGPT, Wikipedia, Facebook, Twitter, Instagram, TikTok, Snapchat, Reddit" or other sources "to search for any information about the case or the law which applies to the case or the people involved in the case, including the parties, the witnesses, the lawyers, and the judge." It went on in the instruction to explain that "[t]he reason

for these instructions is that your verdict must be based only on the evidence presented in this courtroom and the law that I'll provide to you in my instructions." And it cautioned them via the instruction that it was their duty to inform the court immediately if any of them became aware of any violation of the instruction, and that violating the instructions could cause a mistrial or result in the violating party being found in contempt of court.

¶ 11        At some time also on July 7, 2023, a post was published to the blog hosted on the website of the plaintiffs' attorneys' law firm and also to that law firm's public Facebook page. The blog post indicated that it was "posted by Kenneth J. Allen." It was titled "What Jurors Should Know But Don't." The text of the blog post read as follows:

> "Jurors are never told about appeals or when a new trial is ordered. For example, a new trial was recently ordered in the case of *Kroft v. Viper Trans, Inc., PR Rental, Inc.*, 2016-L-009466. 'While it's sad the former Judge rejected the first jury's verdict and threw out all their hard work, the case has been reassigned to a new, tremendous trial judge and we're confident the new trial will be a fair one,' said Kenneth Allen, the lead trial lawyer representing Cindy Kroft. 'Actually, this decision is a blessing as Cindy's condition has gotten much worse since the first trial,' he said. '$43 million now doesn't come close to making up for the grievous human losses and economic harms caused by defendants' inexcusable negligence.'
>
> After the last trial concluded, Cindy Kroft's doctors discovered she has developed a rare complication of spinal cord trauma. The only way to treat this condition is surgically, which very often results in *complete* quadriplegia. 'In other words, Cindy may now become *totally* paralyzed and unable to feel or move any part of her body from the chest down,' said Allen. 'This is a very important fact our first jury was not able to consider in their $43 million

verdict because it only happens to 3% of spinal cord injured patients. So we couldn't even mention it.'

Co-counsel Otto Shragal said, '[O]nce the new jury hears about Cindy's syrinx *and* her brain damage—both were kept from the jury at the last trial—we expect the jury to return a fair and reasonable verdict in a range closer to $100 million. That would serve justice.' But the jury *should* be told this is a new trial so they understand why it's taken so long. Why not?

This is just one example of how jurors are routinely kept in the dark about important evidence. Similarly, jurors never learn that all expenses paid by Medicare, Medicaid and private health insurance must be *repaid* after trial to the insurance companies and the government directly before plaintiffs receive any money. Jurors are also never told that lawyer's fees and expenses, anywhere from one-third to one-half of the jury's verdict—are taken out of Plaintiff's share of the verdict (after repayment of all medical expenses). And if a prior settlement has been made with another party, that settlement is deducted from any verdict.

Jurors are also seldom told that an injured worker *can't* sue a negligent employer, regardless of how egregious the employer's negligence; the employer's only duty is to pay worker's compensation benefits to the injured worker—which, again, the injured person must repay from any verdict he or she wins against another company. And, in criminal cases, the Defendant's past criminal convictions are routinely kept quiet no matter how relevant those past convictions are to the trial.

These laws should be changed so that jurors can learn the *entire* story. If you agree, please write your State Representatives and Senators, and Members of the U.S. Congress, to demand that jurors be told the *whole* truth! Make your voice heard before you or a family

member is called to serve as a 'kept in the dark' juror!" (Emphases in original.) The text of the Facebook post was identical to the blog post. These posts were not discovered by the defendants until the evening of July 12, 2023, as discussed below.

¶ 12       On the afternoon of July 12, 2023, the fourth day of testimony, the defendants made their first motion for a mistrial in the case. This occurred when one of the defendants' attorneys informed the court that an insurance representative monitoring the trial had overheard one juror mention the word "retrial" to other jurors during a sidebar. The defendants' attorneys stated that they were concerned because a search of the plaintiff's name on Google yielded the website of a company that had produced the day-in-the-life video as well as the plaintiffs' attorneys' website advertising the original verdict. The trial court reserved ruling on the motion for mistrial until the conclusion of that day's testimony but in the meantime made the following statement to the jury:

"I just want to make sure that you all understand that you are to rely only on the information and the evidence that you hear in this case. You are not to Google the parties. You're not to Google the witnesses. You're not to Google the attorneys or the Judge. You're not to go to anybody's website to get any information. We have to honor that, guys. You could be found in contempt of court if there's any problem with that. I just want to put that out there."

¶ 13       After concluding with the day's testimony, the trial court heard testimony under oath from a witness, Darren Gallup, about what he had heard a juror say. Gallup stated that when the court and attorneys went into immediate sidebar after the last witness took the stand, jurors started laughing. Gallup stated that he then heard one of the jurors say "retrial" while speaking to the jurors to his left, but he did not hear everything that was said. The trial court stated that merely overhearing the word "retrial" did not provide it with enough information to conclude that anything improper had

occurred, including that jurors had conducted Internet searches involving the first trial. The trial court then denied the defendants' first motion for mistrial.

¶ 14    Prior to the beginning of testimony the following morning, July 13, 2023, the defendants made their second motion for mistrial. Counsel for defendant Viper Trans informed the court that the previous evening, the defendants had discovered the existence of the above-referenced social media posts on the plaintiffs' attorneys' website and Facebook account, which had been posted since July 7, 2023. The court heard extensive argument in which counsel for Viper Trans argued that the posts were a deliberate and premeditated effort by the plaintiffs' attorneys to influence the jury's verdict, particularly through misleading statements about what had occurred at the first trial. Counsel argued that polling the jurors about whether they had conducted any outside investigation or seen the posts would be inappropriate and prejudicial, because jurors would be unlikely to admit to having done so when they had been warned the previous day that it could result in their being held in contempt. He also argued that it would unfairly highlight the existence of the posts.

¶ 15    In response, both of the plaintiffs' attorneys stated that they had not seen the posts prior to that morning and that the blog posts on their law firm's website were written by someone else. Plaintiffs' counsel reminded the court that it had instructed the jurors not to conduct any Internet investigation and that their decisions were to be based only on the evidence presented in court. Counsel urged the court to adhere to the presumption that jurors will follow the instructions that it gives to them. Counsel also argued that the trial court could easily and appropriately resolve the issue by talking to the jurors and asking if they had seen or heard of anything on the Internet pertaining to this case.

¶ 16    After a brief recess, the trial court stated that it was going to bring the jury into the courtroom and address them as a group. It stated as follows:

"Jurors, I know that you are aware that I told you at the very beginning when you were chosen as jurors and then I reminded you again last night that it's very important that nobody discuss this case with anyone else once you're a juror *** other than the fact that you can discuss it with the other jurors when you're deliberating. And do not do any exploration online or talking to anybody or even talking to anybody who saw anything online. All right. Because it's so important as a jury. Your job is so critical to a fair jury trial.

All right. I also told you that if you became aware of any violation of that, to let me know. And you can let me know through telling the deputy or the clerk or me. And I've not heard anything. So my assumption is that nobody has violated this or heard anybody else talk about it. Okay. And I'm just reminding you that you're still under oath as jurors in this case.

There's an issue that's been brought to the Court's attention, and so I'm just going to ask you to raise your hand if you have done any investigation about the lawyers, the case, the parties, the judge, anything past or present about this case or any of the facts of the case, or if you have talked to anybody who may have done some kind of research and informed you of that. Don't tell me what it is you did. But has anybody done that? Please raise your hand.

(No response)

THE COURT: I've got no hands. That's a relief, guys.

It's very important that you remain fair and impartial and give both sides here a fair hearing in this case."

The trial court then stated that it was denying the defendants' second motion for mistrial, but it ordered the plaintiffs' attorneys to immediately have the posts taken down.

¶ 17     The trial then proceeded, and the defendants renewed their motion for mistrial after the

completion of closing arguments. The trial court again denied that motion. The jury thereafter returned a verdict in favor of the plaintiffs that totaled $43,825,000 on both claims ($38,825,000 for Cynthia Kroft and $5,000,000 for Mark Kroft). After it did so, the defendants' counsel pointed out that the amount of the verdict was nearly the precise amount of $43 million that had been mentioned in the plaintiffs' attorneys' social media posts. Defendants' counsel argued that this fact supported their argument that the jury had been tainted by the social media posts and that the defendants had not been given a fair trial. No further motion or ruling occurred at that time.

¶ 18    The defendants thereafter filed posttrial motions in which they sought a new trial, arguing *inter alia* that they had been deprived of a fair trial due to the social media posts published by the plaintiffs' attorneys during trial. The trial court denied the defendants' motions. The trial court stated in its written order that while it "does not condone the posting of the blog and believes it was highly inappropriate," the jury also received multiple admonishments from the court against the use of any social media regarding the trial, the attorneys, or the parties. The trial court also reiterated that it had polled the jury at the time the posts were discovered. It also pointed out that the jury had been polled again at the end of the case, and each juror had confirmed the accuracy of the verdict as given. The trial court also stated in its written order that it was troubled by the publication on September 21, 2023, of a column in the *Chicago Daily Law Bulletin* concerning the plaintiffs' attorneys' social media posts and their potential to result in the granting of a motion for new trial. It wrote that "logic and common sense suggest that the Plaintiff's attorneys would not disseminate that information for the Law Bulletin article." The court wrote that the publication of this column in the *Chicago Daily Law Bulletin* was "more likely to contaminate a potential jury pool that has not [been] admonished to do no social media search[es]."

¶ 19    Following the denial of the defendants' posttrial motions, the plaintiffs filed a motion seeking

prejudgment interest on the verdict to accrue as of July 1, 2021. The defendants filed a joint response to this motion. Among other arguments, they asserted that the only reason that this case was pending after July 1, 2021, was due to the plaintiffs' counsel's own misconduct during the first trial that resulted in the trial court's granting of a new trial. They argued that allowing prejudgment interest in this specific context would be inequitable. Also, they challenged the constitutionality of section 2-1303(c) of the Code of Civil Procedure (735 ILCS 5/2-1303(c) (West 2022)), which allows for prejudgment interest in personal injury cases.

¶ 20    The trial court granted the plaintiffs' motion and allowed prejudgment interest for the period from July 1, 2021, through July 14, 2023, at 6% per annum. The trial court reasoned that the plain language of section 2-1303(c) did not give a trial court any discretion about whether to allow prejudgment interest or provide any method by which a court could determine which party was at fault for any delay that may have resulted. The trial court also recognized that this court had upheld the constitutionality of section 2-1303(c), and the trial court stated that it would follow that law.

¶ 21                                II. ANALYSIS

¶ 22                    A. Standing of Viper Trans to Appeal

¶ 23    During briefing, the plaintiffs raised a jurisdictional challenge to the standing of defendant Viper Trans to pursue this appeal, which we ordered to be taken with the case. This jurisdictional challenge arises from the fact that, on March 23, 2022, following the verdict in the first trial, Viper Trans filed a petition for chapter 7 bankruptcy. That bankruptcy filing resulted in an automatic stay of this litigation against Viper Trans. See 11 U.S.C. § 362(a)(1) (2018). The bankruptcy court appointed Gina B. Krol as trustee for the bankruptcy estate of Viper Trans. On June 27, 2023, the bankruptcy court entered an order modifying the automatic stay to allow the plaintiffs to litigate the present case "to a final judgment in whatever amount state law allows" and, "once judgment

is obtained, collect the judgment against Viper Trans, Inc. outside of the bankruptcy court solely to the extent of any insurance proceeds."

¶ 24    The present appeal is pursued in the name of Viper Trans, not its bankruptcy estate. The plaintiffs argue that this is improper because only the bankruptcy trustee has legal standing to appeal the judgment entered against Viper Trans. They provide an affidavit by Krol stating that the present appeal by Viper Trans "was not filed by me, was not filed at my direction, nor was it filed with my authorization." Krol's affidavit further states that in her "business judgment," an appeal of the judgment in the case at bar "is not in the best interest of Viper's Bankruptcy Estate." The plaintiffs thus argue that Viper Trans lacks standing to pursue this appeal. They further argue that the bankruptcy court's order modifying the automatic stay only allowed the plaintiffs to proceed to trial and judgment against Viper Trans and that it did not contemplate litigation of any appeal by either party. Accordingly, they contend that Viper Trans is pursuing this appeal in derogation of the automatic bankruptcy stay and that it is therefore without legal effect.

¶ 25    In response, Viper Trans first argues that the bankruptcy court's order allowing the plaintiffs to litigate the present case "to a final judgment" clearly encompasses an appeal by which Viper Trans may challenge the propriety of the trial court judgment against it. Second, Viper Trans argues that its right to take this appeal and defend against an adverse judgment is not property of the bankruptcy estate or controlled by the bankruptcy trustee. Viper Trans argues that the position taken by the bankruptcy trustee in this case is likely due a "blatant conflict of interest" whereby the present plaintiffs' counsel has also been retained by Viper Trans' bankruptcy trustee to pursue bad faith and legal malpractice actions against its insurer and prior trial counsel.

¶ 26    We agree with Viper Trans that its right to pursue the present appeal on its own behalf is allowed by the bankruptcy court's order of June 27, 2023, and that it is not acting in violation of

the automatic stay by pursuing this appeal. Initially, we acknowledge our own jurisdiction to interpret the scope of the automatic bankruptcy stay in a case pending before us. See *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation*, 140 B.R. 969, 973 (Bankr. N.D. Ill. 1992) ("it is settled that both the bankruptcy court and the court in which the other litigation exists may construe the automatic stay"); *In re Lengacher*, 485 B.R. 380, 384 (Bankr. N.D. Ind. 2012) ("non-bankruptcy courts, both state and federal, have and must have the power to decide whether and to what extent the automatic stay applies to the cases before them"); *Performance Food Group Co. v. ARBA Care Center of Bloomington, LLC*, 2017 IL App (3d) 160348, ¶ 26.

¶ 27 The bankruptcy court's order of June 27, 2023, was phrased as authorizing the plaintiffs to "litigate the case *** to a final judgment" and thereafter to "collect the judgment against Viper Trans, Inc. outside of the bankruptcy court solely to the extent of any insurance proceeds." The general rationale for lifting an automatic stay to allow a personal injury action to proceed in this fashion is that the litigation does not jeopardize the debtor's bankruptcy estate; instead, it is merely a means of determining liability that serves as a predicate for a plaintiff to recover against an insurer that has " 'assumed full financial responsibility for defending that litigation.' " See *Matter of Fernstrom Storage & Van Co.*, 938 F.2d 731, 735-36 (7th Cir. 1991) (quoting *Matter of Holtkamp*, 669 F.2d 505, 508-09 (7th Cir. 1982)). Thus, despite the order's phrasing only as empowering the plaintiffs to act, it must also be interpreted as giving a corollary authorization to the insurer that is financially responsible for defending the litigation and paying the proceeds to litigate the case to final judgment without violating the automatic stay.

¶ 28 Under Illinois law, an appeal is considered a continuation of the proceedings commenced in the trial court (Ill. S. Ct. R. 301 (eff. Jan. 1, 1994)) and, where an appeal is being pursued, a final

judgment does not exist until the court of review has rendered a decision. *Bates v. Board of Education, Allendale Community Consolidated School District No. 17*, 136 Ill. 2d 260, 269 (1990). Accordingly, this case has not yet been litigated to a final judgment. For these reasons, we reject the argument that this appeal brought in the name of Viper Trans is outside the scope of the bankruptcy court's order modifying the automatic stay or that Viper Trans otherwise lacks standing or authorization to pursue it.

¶ 29                              B. Mistrial Due to Social Media Posts

¶ 30        Turning to the merits, the defendants' primary argument on appeal is that the trial court abused its discretion by denying their motion for mistrial and their posttrial motion for a new trial based upon the social media posts that were published by the plaintiffs' attorneys' law firm during trial. They argue that these social media posts constituted a deliberate effort to reach the jury and to influence its verdict by circumventing multiple rules that exist to ensure that justice is fairly administered to all parties in civil trials. They contend that the conduct of the plaintiffs' attorneys in making these social media posts during trial was such a deliberate assault on the integrity of the trial process that it must be deemed inherently prejudicial to the defendants' right to a fair trial. They further contend that the trial court's questioning of the jurors as a group and in a "highly suggestive manner" was not a sufficient investigation to confirm that the posts had not been viewed by any juror and to thereby ensure that no prejudice had resulted to the defendants from the publication of the posts.

¶ 31        For their part, the plaintiffs urge us to view this issue as merely a question of whether the jury was exposed to extraneous information relating to the case that may have improperly influenced its verdict. See *Pietrzak v. Rush-Presbyterian-St. Luke's Medical Center*, 284 Ill. App. 3d 244, 250-52 (1996). They assert that the defendants' arguments are nothing more than histrionics and

feigned indignation about social media posts that are "completely irrelevant" because there was no showing that they were ever seen by any juror. The plaintiffs rely heavily on the fact that the trial court gave the jury cautionary instructions on multiple occasions not to conduct any outside research, including on the Internet or social media, and they cite the presumption that jurors are presumed to follow the instructions given by the trial court. See *Russo v. Corey Steel Co.*, 2018 IL App (1st) 180467, ¶ 75. They also rely on the fact that no juror raised a hand when the trial court asked whether any jurors had conducted any outside research during the case. They contend that no Illinois case supports the proposition that prejudice can exist where there is no showing that extrajudicial information reached any juror.

¶ 32    A mistrial, as that term is used in the present context, occurs when a trial is brought to an end without determination on the merits because of a procedural error or serious misconduct that occurs during the proceedings. See *Redmond v. Socha*, 216 Ill. 2d 622, 640 (2005). A trial court is vested with broad discretion to determine the propriety of declaring a mistrial (*McDonnell v. McPartlin*, 192 Ill. 2d 505, 534 (2000)), and its ruling on a motion for mistrial will not be reversed absent a clear abuse of discretion. *Colls v. City of Chicago*, 212 Ill. App. 3d 904, 953 (1991). Generally, a motion for mistrial should be granted where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice. *People v. Bishop*, 218 Ill. 2d 232, 251 (2006). A mistrial is properly declared where an alleged error prejudices the complaining party or otherwise impairs that party's right to a fair trial. See *McDonnell*, 192 Ill. 2d at 534-35.

¶ 33    One touchstone of a fair trial is an impartial trier of fact, meaning " 'a jury capable and willing to decide the case solely on the evidence before it.' " *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982));

accord *Waldorf v. Shuta*, 3 F.3d 705, 709 (3d Cir. 1993) ("It is fundamental that every litigant who is entitled to trial by jury is entitled to an impartial jury, free to the furthest extent practicable from extraneous influences that may subvert the fact-finding process").

¶ 34        Few reported decisions have come to this court's attention in which some out-of-court action or conduct having the potential to influence the jurors was undertaken by an attorney, a party, or someone acting on behalf of an attorney or party.[1] While cases involving such issues are highly fact-dependent, one sentiment that we find commonly expressed in them is that ensuring public confidence in the judicial system and in the outcomes of jury trials requires that courts strictly guard against any suspicion that the jury has been subjected to outside influences by the conduct of attorneys, parties, or those acting on their behalf, which might affect the jury's verdict. See *e.g.*, *United States v. Bowen*, 969 F. Supp. 2d 546, 577-78 (E.D. La. 2013), *aff'd* 799 F.3d 336 (5th Cir. 2015); *Budoff v. Holiday Inns, Inc.*, 732 F.2d 1523, 1525-26 (6th Cir. 1984). This is likewise a longstanding principle of Illinois law.

¶ 35        In *Mobile & O.R. Co. v. Davis*, 130 Ill. 146, 151-56 (1889), the supreme court held that a new trial should have been granted in a civil case in which an attorney socialized with a juror at a saloon during the trial. In doing so, the court stated, "The jury-box must be free from improper influences. *** If the administration of justice is to be kept pure and above reproach, every appearance of a want of impartiality on the part of juries must be discountenanced." *Id.* at 154. The supreme court went on to state:

> " 'We cannot be too strict in guarding trials by jury from improper influence. This strictness is necessary to give due confidence to the parties in the results of their cases; and

---

[1] The parties direct our attention to a trial court decision by a Georgia state court granting a new trial based on an attorney's social media posts similar to this case.

every one ought to know that for any, even the least, intermeddling with jurors, a verdict will always be set aside.' " *Davis*, 130 Ill. at 156 (quoting *Knight v. Inhabitants of Freeport*, 13 Mass. 218, 220 (1816)).

In *Vane v. City of Evanston*, 150 Ill. 616 (1894), which involved the conduct of a litigant in procuring lunch for the jury, our supreme court stated the following:

"Tampering with juries by the successful party litigant, or doing any act, out of the presence of the court, which would have a tendency to bias or prejudice them in the consideration of the cause, will ordinarily afford sufficient ground for granting a new trial. No right is more valuable to the citizen, or more important in the due and orderly administration of justice, than that jurors should be kept absolutely free from anything that might improperly influence their deliberations. *** [P]ublic policy requires, and the pure and orderly administration of justice demands, that the jury, to whom the law commits the rights, liberties, and lives of men, should be kept absolutely free from suspicion. The law will not tolerate the slightest suspicion that the successful litigant has corrupted or improperly influenced the jury, or that the jurors have been directly or indirectly tampered with, lest justice be subverted, and its administration be brought into contempt." *Id.* at 625-26.

Although these principles were set forth well over a century ago, they remain good law, and we find them applicable to our consideration of the issues we confront in this case.

¶ 36          Furthermore, because this case involves the conduct of Illinois attorneys, we also look for guidance to Rule 3.6(a) of the Illinois Rules of Professional Conduct of 2010 (hereinafter "Illinois Professional Conduct Rule 3.6(a)"). Ill. R. Pro. Conduct (2010) R. 3.6(a) (eff. Jan. 1, 2010). That rule provides in relevant part:

"A lawyer who is participating *** in the *** litigation of a matter shall not make an

extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and would pose a serious and imminent threat to the fairness of an adjudicative proceeding in the matter." *Id.* The comments to this rule recognize that there are "certain subjects that would pose a serious and imminent threat to the fairness of a proceeding, particularly when they refer to a civil matter triable to a jury." Ill. R. Pro. Conduct (2010) R. 3.6 cmt. 5 (eff. Jan. 1, 2010). This includes "information that the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and that would, if disclosed, create a substantial risk of prejudicing an impartial trial." Ill. R. Pro. Conduct (2010) R. 3.6 cmt. 5(5) (eff. Jan. 1, 2010).

¶ 37 With these principles in mind, we agree with the defendants that the trial court abused its discretion in denying their motion for a mistrial. We reach this conclusion based upon the serious effort that was made by the plaintiffs' attorneys during trial to reach the jury and influence its verdict by communicating information that was highly prejudicial to the defendants' right to a fair trial. We also find a clear abuse of discretion in the manner by which the trial court investigated whether the social media posts had in fact come to the attention of any juror, the results of which served as the basis for its denial of the defendants' motion for mistrial.

¶ 38 As discussed below, there are multiple factors in this case that lead this court to believe that this was an intentional effort by the plaintiffs' attorneys to have these posts somehow reach the jury. However, even if this was not intentional, the publication of these posts during trial certainly demonstrates a reckless disregard by the plaintiffs' attorneys for the likelihood that jurors deciding this case could have been exposed to information about it that was inaccurate, misleading, and in contravention of well-established rules governing the information received by juries during personal injury trials.

¶ 39    In addressing this issue, we begin by noting that the plaintiffs' appellate brief devotes minimal explanation or argument as to the plaintiffs' attorneys' intent behind the publication of the posts during the trial. At most, they refer to the posts as "discuss[ing] the personal opinions of counsel regarding what information jurors should generally be provided." They primarily argue that the intent of the posts is "an entirely irrelevant red herring" due to the absence of any showing that the posts were ever seen by any juror. We disagree.

¶ 40    In our view, the first and most obvious indication that these posts were intended to be findable is the use within them of the precise search terms that a person interested in this case would most likely know to search on the Internet. Most particularly, it is the inclusion in the posts of the case's full caption and docket number: "*Kroft v. Viper Trans, Inc., PR Rental, Inc.*, 2016-L-009466." It thus includes the full names of two of the three defendants, along with the names of plaintiff Cindy Kroft and of plaintiffs' attorneys Kenneth J. Allen and Otto Shragal. If the purpose of the post was, as the plaintiffs contend, merely to express "the personal opinions of counsel regarding what information jurors should generally be provided," there would seem to be little reason to include information such as the full caption and docket number of this case or the full names of its parties.

¶ 41    Relatedly, the sites on the Internet where these posts were published were sites that a person interested in this case or the plaintiffs' attorney trying it would be likely to look for information—the website and Facebook page of the plaintiffs' attorneys' law firm. The plaintiffs argue on appeal that the fact that some of the jurors mentioned recognizing plaintiffs' counsel from his commercials on television "in no way suggests that the jurors read the blog post." However, we cannot ignore the fact that we are dealing in this case with an attorney who has invested heavily in his own name recognition through television advertising. We believe that plaintiffs' counsel's higher name recognition made it more likely that potential jurors would be interested in accessing

his law firm's website or social media pages and that they would know how to do so. This may also be true of any family members or friends to whom prospective jurors may have mentioned that their jury service involved a lawyer recognizable from television, who might then share the information from the posts at issue with the juror.

¶ 42       The third factor is the timing of the posts' publication. They were published on July 7, 2023, which was the second and final day of jury selection in this case. They then remained publicly accessible throughout most of the trial, until the trial court ordered them taken down on July 13, 2023. Accordingly, these would have been among the first posts that a person visiting either of these sites during the trial would have seen. Again, if this post was merely counsel's personal opinions as to "what information jurors generally should be provided," it seems highly coincidental that it was posted during jury selection in this specific case.

¶ 43       The final factor is the way that the headline and text of the posts are blatantly directed toward grabbing the attention specifically of persons serving as jurors. It is difficult to imagine a headline more directly crafted toward getting the attention of a person serving as a juror than "What Jurors Should Know But Don't." And then the text itself is couched as an equally attention-grabbing accusation that jurors are improperly being "kept in the dark about important evidence" specific to this case.

¶ 44       Based upon the factors above, we conclude that these social media posts constituted a real and serious effort to reach the jurors deciding this case. Again, even if the conduct was not intentional, the posts were certainly published with reckless disregard for the reasonable likelihood that they might come to the attention of the jury during the trial of this case.

¶ 45       Beyond merely showing an effort to reach the jury, however, the content of the posts shows that they were also an attempt to have the jury return an inflated verdict by circumventing rules of

evidence and trial procedure that exist in personal injury cases to ensure that both plaintiffs and defendants receive a fair trial. In accordance with these rules, an attorney would never be allowed during *voir dire*, opening statements, the questioning of witnesses, or closing argument to inform the jury that a prior jury in the same case had reached a verdict in a specific amount but that, in doing so, it had not been allowed to consider all the evidence that was being presented to the second jury. An attorney would never be allowed to argue that the first jury's verdict was inadequate and that, because the second jury received evidence not presented to the first jury, a fair and reasonable verdict would be over twice as much as the first verdict.

¶ 46    Thus, the social media posts at issue sought to accomplish something that the plaintiffs' attorneys could never do in the courtroom—inform jurors that the first trial had resulted in a $43 million verdict that the judge had "rejected," thereby essentially setting a floor for the second jury's verdict; tell them that the jury in the first trial did not consider evidence of the plaintiff's syrinx and her possibility of developing total paralysis; and argue that once the new jury did consider evidence of the syrinx and of brain damage that was "kept from the jury at the last trial," a fair and reasonable verdict would be closer to $100 million. These would all be highly improper and prejudicial statements for an attorney to make in the courtroom.

¶ 47    The posts at issue went further than conveying improper information about this specific case, though. They also sought to inform the jury about multiple other general topics that, under the fundamental rules of evidence and trial practice, an attorney would never be allowed to reference in front of the jury in a courtroom. This includes information (1) "that all expenses paid by Medicare, Medicaid and private health insurance must be *repaid* after trial to the insurance companies and the government directly before plaintiffs receive any money," (2) "that lawyer's fees and expenses, anywhere from one-third to one-half of the jury's verdict—are taken out of

Plaintiff's share of the verdict (after repayment of all medical expenses)," (3) and that "if a prior settlement has been made with another party, that settlement is deducted from any verdict." (Emphasis in original.) It seems that the intent of making such points would be to inflate the jury's verdict by informing it that the individual plaintiffs themselves would not receive the full amount of the verdict it returned; the hope is that the jury would then return a higher verdict to account for the various deductions or distributions that would be applied to the verdict. Had statements of this nature been made by an attorney in the courtroom with an intent to influence or prejudice the jury, it would have been clear grounds for declaring a mistrial. See *Seldin v. Babendir*, 325 Ill. App. 3d 1058, 1064 (2001).

¶ 48     Again, though, these posts go beyond an attempt to circumvent the well-established rules concerning information that a jury may receive in the courtroom. The posts also contain inaccurate and misleading information, specifically the statement that the new jury would hear evidence about the plaintiff's "syrinx and her brain damage" that "were kept from the jury at the last trial." (Emphasis omitted.) To a layperson reading the post, the implication is that the keeping of this evidence from the jury was wrongful and was the reason for the new trial. This statement is misleading, because the record discloses that neither of these injuries were "kept" from the first jury. The syrinx had not been diagnosed at the time of the first trial, and thus it could not have been discussed. And any evidence concerning the plaintiff's brain atrophy was barred at the first trial on the basis that the plaintiffs' attorneys failed to disclose medical testimony to support it. Thus, the ordering of a new trial had nothing to do with the first jury not hearing this evidence. Instead, the basis for the trial court's granting of the new trial were multiple prejudicial statements made by plaintiffs' counsel during closing argument and his attempts to introduce evidence of brain injury despite the failure to properly disclose this testimony. The social media posts,

however, leave the reader with the inaccurate impression that the new trial had to do with the exclusion of evidence of the syrinx and brain damage, not the misconduct of plaintiffs' counsel.

¶ 49        One need only read Illinois Professional Conduct Rule 3.6(a) to understand that it is highly improper for attorneys trying a case to disseminate statements of the above nature via social media during trial. Ill. R. Pro. Conduct (2010) R. 3.6(a) (eff. Jan. 1, 2010). Again, that rule of professional conduct provides that a lawyer participating in litigation "shall not make an extrajudicial statement that the lawyer knows *or reasonably should know* will be disseminated by means of public communication and would pose a serious and imminent threat to the fairness of an adjudicative proceeding in the matter." (Emphasis added.) *Id.* As the comments to that rule indicate, this includes in a civil jury trial "information that the lawyer knows *or reasonably should know* is likely to be inadmissible as evidence in a trial and that would, if disclosed, create a substantial risk of prejudicing an impartial trial." (Emphasis added.) Ill. R. Pro. Conduct (2010) R. 3.6 cmt. 5(5) (eff. Jan. 1, 2010). Here, it is beyond dispute that the plaintiffs' attorneys reasonably should have known that the social media posts they were publishing during trial included an egregious amount of information that would seriously threaten the fairness of this trial and the impartiality of the jury if such information was disclosed to the jurors. It would seem that the disclosure of any single statement discussed in the preceding paragraphs might well violate the letter or spirit of Illinois Professional Conduct Rule 3.6(a); but in totality, the extent of the prejudicial information that the plaintiffs' attorneys included in these posts is shocking to this court and is certainly in violation of that rule.

¶ 50        It should go without saying that an integral aspect of the fair administration of justice through our legal system is that the attorneys litigating a case act properly, professionally, and ethically both inside and outside the courtroom. That is certainly the expectation of this court, both at the

appellate and trial court levels. By publishing these social media posts during the trial of this case, the plaintiffs' attorneys have grievously disappointed this court's expectation of proper, professional, and ethical conduct.

¶ 51 As stated above, however, the plaintiffs' argument is that regardless of how significant we may consider the attorney misconduct that occurred in this case, the determinative factor is nevertheless that the defendants are unable to show that any juror ever saw the posts. Asserting that this case merely presents "the age-old question of whether the jury was exposed to extraneous information," the plaintiffs argue that overturning the verdict requires the defendants to prove that the posts reached the jury and may have influenced its verdict. See *Pietrzak*, 284 Ill. App. 3d at 250. The plaintiffs argue that the defendants have failed to meet this burden. The plaintiffs also emphasize that the trial court instructed the jury prior to opening statements not to conduct any Internet or social media research into the case or the people involved in it. See Illinois Pattern Jury Instructions, Civil, No. 1.01(A) (rev. Feb. 2023). They assert that the social media posts were published only after this instruction was given. And they repeatedly cite the principle that the jury is presumed to follow the instructions given to it by the trial court. See *Russo*, 2018 IL App (1st) 180467, ¶ 75. They contend that the premise of the defendants' arguments "flies in the face of this well-established principle" and "assumes that the jurors not only disobeyed the court's instructions but also committed perjury."

¶ 52 We reject the plaintiffs' argument that the controlling factor in this case is that the defendants did not show that any juror saw the posts. First, given the serious attorney misconduct that occurred here, we do not find it appropriate to decide this case merely by resorting to the presumption that jurors follow the instructions given by the trial court. It strikes us the ability to later make this argument may have fostered a belief on the part of the plaintiffs' attorneys that they could publish

these social media posts with impunity in the hope that somehow one or more jurors would not actually follow the court's instruction not to research this case on the Internet or social media. The rule that juries are presumed to follow instructions "is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests" of all parties to litigation. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). We further find the presumption to be inapplicable because the record is wholly silent as to the exact time on July 7, 2023, that the posts were published relative the time, which was sometime midday, when the jurors were sworn and given the instruction not to look at social media or the Internet. Accordingly, these posts may well have existed throughout jury selection that morning, prior to the empaneled jury's receipt of this instruction from the trial court.

¶ 53    Second, and more significantly, we find a clear abuse of discretion by the trial court in the manner by which it investigated and determined that the social media posts at issue had not come to the attention of any jurors. Generally, it is within the trial court's discretion to determine how best to investigate whether extraneous information has reached the jury and the impact of this information on the parties' right to a fair trial. See *Van Hattem v. Kmart Corp.*, 308 Ill. App. 3d 121, 129-30 (1999). Each case is determined on its own facts, " 'with due consideration to the nature and character of the statements themselves.' " *Id.* at 129 (quoting *People v. Talley*, 152 Ill. App. 3d 971, 980 (1987)). However, this court has found abuse of discretion when trial courts have conducted inquiries that were inadequate to ascertain the fact or the full extent of a jury's knowledge in light of the nature and character of statements by which a jury may have been tainted. See *id.* at 130-31; *McGee v. City of Chicago*, 2012 IL App (1st) 111084, ¶¶ 29, 33.

¶ 54    In our view, the inquiry that the trial court conducted into whether the social media posts had come to the jurors' attention suffered from multiple serious shortcomings. One significant problem

was the highly suggestive nature of the statements made by the trial court both before and after it posed its key question to the jurors. The trial court stated:

"Jurors, I know that you are aware that I told you at the very beginning when you were chosen as jurors and then I reminded you again last night that it's very important that nobody discuss this case with anyone else once you're a juror *** other than the fact that you can discuss it with the other jurors when you're deliberating. And do not do any exploration online or talking to anybody or even talking to anybody who saw anything online. All right. Because it's so important as a jury. Your job is so critical to a fair jury trial.

All right. I also told you that if you became aware of any violation of that, to let me know. And you can let me know through telling the deputy or the clerk or me. And I've not heard anything. So my assumption is that nobody has violated this or heard anybody else talk about it. Okay. And I'm just reminding you that you're still under oath as jurors in this case.

There's an issue that's been brought to the Court's attention, and so I'm just going to ask you to raise your hand if you have done any investigation about the lawyers, the case, the parties, the judge, anything past or present about this case or any of the facts of the case, or if you have talked to anybody who may have done some kind of research and informed you of that. Don't tell me what it is you did. But has anybody done that? Please raise your hand.

(No response)

THE COURT: I've got no hands. That's a relief, guys.

It's very important that you remain fair and impartial and give both sides here a fair hearing in this case."

¶ 55 We agree with the defendants' argument that the prefatory statements made by the trial court

prior to posing its question to the jury were too suggestive toward a negative answer and may have primed the jurors away from being publicly forthcoming about whether the social media posts at issue had in fact come to their attention. We are troubled by the way that the trial court, prior to posing its question, repeatedly emphasized how "very important" and "critical to a fair jury trial" it was that jurors not conduct Internet investigations about the case or talk to anybody who had seen anything online. Most troubling is that the trial court twice referred to such conduct as a "violation" and immediately prior to posing its question stated, "So my assumption is that nobody has violated this or heard anybody else talk about it. Okay. And I'm just reminding you that you're still under oath as jurors in this case."

¶ 56    We emphasize that the court here was not investigating suspected *juror* misconduct. It was investigating whether prejudice had resulted from *attorney* misconduct. Specifically, it was investigating the realistic possibility that attorneys trying the case before it had engaged in jury tampering. Thus, given the importance of getting to the truth of whether any jurors had seen these social media posts, it was not a reasonable or judicious means of investigation for the trial court to repeatedly emphasize the importance of jurors not investigating the case on the Internet or to refer to this as a "violation" of their oaths as jurors immediately prior to asking them to publicly volunteer whether they had done this or knew about it. Moreover, the trial court compounded the problem by stating "[t]hat's a relief, guys" after no juror raised a hand in response to its question. As with its prefatory statements, this expression of relief at having received a negative answer may have dissuaded a juror from later coming forth privately after having time to reflect on the trial court's question. We thus agree with the defendants that this manner of questioning was not a reasonable means of ascertaining the truth of whether these posts had come to the attention of any juror and thus whether the defendants had suffered prejudice from the plaintiffs' attorneys'

conduct.

¶ 57    Relatedly, we also find that the trial court abused its discretion by collectively inquiring of the jurors as a group in open court. Instead, we find that questioning the jurors individually in chambers was the only reasonable method that could have ensured with requisite certainty that no juror had become aware of the social media posts and thus no prejudice had resulted from the plaintiffs' attorneys' publication of them. See *McGee*, 2012 IL App (1st) 111084, ¶ 33. Any reasonable judge should have recognized that, given that the subject of investigation was a real and serious effort by attorneys trying the case to reach and influence the jury through the Internet or social media, the risk was simply too great that jurors would not be forthcoming on collective questioning in open court about what they had privately viewed on the Internet or learned from others. This is particularly true when the jurors had been admonished the day before that they could be found in contempt of court for seeking information on the Internet about the case, and they may have been uncertain as to what punitive consequences they faced if they admitted to knowledge of the social media posts. Individual questioning in chambers was necessary to obviate such concerns by the jurors and allow them to speak freely about whether they had become aware of any information on the Internet about this case.

¶ 58    For these reasons, we hold that a clear abuse of discretion occurred in the manner by which the trial court investigated whether any jurors were aware of the highly prejudicial social media posts that were published by the plaintiffs' attorneys during trial. Based upon the above shortcomings in the trial court's investigation, the fact that no juror raised a hand in response to the trial court's inquiry was not a reasonable basis from which to conclude that the social media posts at issue had not come to the attention of any juror or that therefore the defendants had suffered no prejudice from the publication of the posts. Thus, because the trial court's denial of the

defendants' motion for mistrial was based on the results of its insufficient investigation, we hold that the trial court's denial of the motion for mistrial was an abuse of discretion. We therefore vacate the verdict of the jury and remand the case for a new trial.

¶ 59    In light of our conclusion that a clear abuse of discretion occurred in the manner by which the trial court investigated whether the social media posts had come to the attention of the jurors, we do not need to conclusively decide whether the mere publication of these posts during trial was so inherently prejudicial to the defendants' right to a fair trial that a new trial is warranted even absent a showing that any juror saw the posts. However, we wish to make clear that we believe there is merit to this argument. We believe also that it is important to establish a clear precedent that the appellate court will not tolerate any attempts by attorneys, litigants, or those acting on their behalf to use social media or the Internet to communicate information to jurors outside the normal courtroom process. It seems deeply unfair for any party to be placed in the position of needing to investigate whether sitting jurors have been exposed to attempts at undue influence through social media by an opponent. It also risks creating a game of "catch me if you can" if such misconduct through social media brings about a mistrial only when a party can prove that his or her opponent was successful in an effort toward jury tampering. If courts overlook this kind of misconduct or consider it harmless, it is only a matter of time before another attorney succeeds at what was attempted here.

¶ 60                                C. Prejudicial Statements and Arguments

¶ 61    Given our conclusion that this case must be remanded for retrial, we do not need to consider the defendants' alternative argument that a new trial is required due to the cumulative effect of various allegedly prejudicial and inflammatory statements and argument by plaintiffs' counsel throughout the trial. The defendants do not raise these as individual trial errors, and most of the

challenged comments either were not subject to a timely objection or were subject to an objection that was sustained.

¶ 62                                            D. Liability Evidence

¶ 63        The defendants raise one argument concerning the admission of evidence, which we will address based upon its potential to arise again at retrial. The trial court below allowed the plaintiffs to admit into evidence and publish to the jury two photographs showing damage sustained by the plaintiff's vehicle in the collision. The plaintiffs ended up using only one photograph at trial. The defendants argue that because they were not disputing the plaintiff's injuries from the collision, the trial court erred by allowing admission and publication of this photograph.

¶ 64        In a trial where the defendant admits liability for the plaintiff's injuries and the only issue for the jury is the amount of compensatory damages, evidence tending only to prove a defendant's fault is not relevant, and its introduction can amount to reversible error. *Bullard v. Barnes*, 102 Ill. 2d 505, 519 (1984). Specifically with respect to postcollision photographs showing damage to vehicles, the general rule is that such photographs are admissible at the discretion of the trial court, provided the court determines that the jury can understand the evidence and relate the vehicular damage depicted to the injury without the aid of an expert witness. *Peach v. McGovern*, 2019 IL 123156, ¶ 40. Such postcollision photographs can be relevant to issues of proximate causation and injury and can aid in a jury's evaluation of testimony concerning the nature of an impact. *Id.* ¶ 38. If a jury is allowed to consider relevant testimony concerning a vehicle's speed and impact forces, it should be permitted to consider photographs that depict the damage done, or lack thereof, to the vehicles. *Id.* ¶ 39.

¶ 65        Here, the trial court explained its reasoning that, although the defendants were not disputing the existence of the injuries themselves, they were disputing the severity and longevity of those

injuries. The trial court thus reasoned that it was appropriate to allow some explanation into the collision and the forces involved to help the jury evaluate the severity of the injuries, which included showing the jury the photograph of the damage to the plaintiff's car. We find no abuse of discretion in this ruling by the trial court.

¶ 66                                    E. Prejudgment Interest

¶ 67        The defendants raise an equitable challenge to the trial court's allowance of statutory prejudgment interest upon the jury verdict, accruing as of July 1, 2021. We recognize that this is also an issue that is likely to arise again upon remand, as the only issue for the jury on retrial involves the amount of the plaintiffs' compensatory damages. Accordingly, we will proceed to address this argument in the interest of judicial economy.

¶ 68        Prior to July 1, 2021, no Illinois statute allowed for the recovery of prejudgment interest in personal injury or wrongful death cases. This changed when section 2-1303(c) of the Code of Civil Procedure became effective as of that date. See Pub. Act 102-6, § 5 (eff. July 1, 2021) (adding 735 ILCS 5/2-1303(c)). While we set forth its full text below, the statute establishes July 1, 2021, as the date from which prejudgment interest began to accrue in then-pending actions for personal injury or wrongful death. See 735 ILCS 5/2-1303(c) (West 2022).

¶ 69        The defendants argue that allowing prejudgment interest in the context of this case is unjust and inequitable, because the only reason this case remained pending after July 1, 2021, was that the plaintiffs' counsel engaged in such significant misconduct at the first trial that it led the trial court to grant the defendants' motion for a new trial. They argue that allowing prejudgment interest in this context rewards bad behavior by allowing plaintiffs' counsel to indirectly profit from his

own misconduct that has resulted in this case continuing to pend long after July 1, 2021.[2]

¶ 70        The trial court below took the view that prejudgment interest was mandatory under section 2-1303(c) and that the plain language of that statute does not provide a court with any discretion to deny or reduce an award of prejudgment interest. The trial court noted that the statute expressly provides for only one instance in which interest does not accrue (which is that interest is tolled from the date of a voluntary dismissal to the date of refiling) and includes "no language tolling the accrual of interest for any other circumstance." The trial court also noted that the statute did not provide any method by which a trial court could determine whether one party was at fault for a delay that may have occurred in the case.

¶ 71        The defendants make no reference to the trial court's rationale for denying their request. They do not argue that the trial court erred or contend that the trial court incorrectly interpreted section 2-1303(c). However, the reasoning employed by the trial court requires us to interpret the statute. The fundamental rule of statutory interpretation is to ascertain and give effect to the legislature's intent. *Mosby v. Ingalls Memorial Hospital*, 2023 IL 129081, ¶ 30. The language of the statute is the best indication of legislative intent, and courts give that language its plain and ordinary meaning. *Id.* Where that statutory language is plain and unambiguous, courts may not depart from it by reading into the law exceptions, limitations, or conditions that the legislature did not express. *Id.* ¶ 31. However, courts interpreting a statute may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing a law one way or another. *Id.* Questions of statutory interpretation are reviewed *de novo*. *Id.* ¶ 29.

¶ 72        The statute at issue, section 2-1303(c) of the Code of Civil Procedure (735 ILCS 5/2-1303(c)

---

[2] The reasonableness of allowing attorney fees on the portion of the plaintiffs' recovery that reflects prejudgment interest is not the question before us, and we express no position on that issue.

(West 2022)), provides as follows:

"In *all* actions brought to recover damages for personal injury or wrongful death resulting from or occasioned by the conduct of any other person or entity, whether by negligence, willful and wanton misconduct, intentional conduct, or strict liability of the other person or entity, the plaintiff *shall* recover prejudgment interest on *all* damages, except punitive damages, sanctions, statutory attorney's fees, and statutory costs, set forth in the judgment. Prejudgment interest *shall* begin to accrue on the date the action is filed. If the plaintiff voluntarily dismisses the action and refiles, the accrual of prejudgment interest shall be tolled from the date the action is voluntarily dismissed to the date the action is refiled. In entering judgment for the plaintiff in the action, the court *shall* add to the amount of the judgment interest calculated at the rate of 6% per annum on the amount of the judgment, minus punitive damages, sanctions, statutory attorney's fees, and statutory costs. If the judgment is greater than the amount of the highest written settlement offer made by the defendant within 12 months after the later of the effective date of this amendatory Act of the 102nd General Assembly or the filing of the action and not accepted by the plaintiff within 90 days after the date of the offer or rejected by the plaintiff, interest added to the amount of judgment shall be an amount equal to interest calculated at the rate of 6% per annum on the difference between the amount of the judgment, minus punitive damages, sanctions, statutory attorney's fees, and statutory costs, and the amount of the highest written settlement offer. If the judgment is equal to or less than the amount of the highest written settlement offer made by the defendant within 12 months after the later of the effective date of this amendatory Act of the 102nd General Assembly or the filing of the action and not accepted by the plaintiff within 90 days after the date of the offer or rejected by the plaintiff, no prejudgment interest

shall be added to the amount of the judgment. For the purposes of this subsection, withdrawal of a settlement offer by defendant shall not be considered a rejection of the offer by the plaintiff. Notwithstanding any other provision of this subsection, prejudgment interest shall accrue for no longer than 5 years.

Notwithstanding any other provision of law, neither the State, a unit of local government, a school district, community college district, nor any other governmental entity is liable to pay prejudgment interest in an action brought directly or vicariously against it by the injured party.

For any personal injury or wrongful death occurring before the effective date of this amendatory Act of the 102nd General Assembly, the prejudgment interest *shall* begin to accrue on the later of the date the action is filed or the effective date of this amendatory Act of the 102nd General Assembly." (Emphases added.) *Id.*

¶ 73    We agree with the trial court that the plain language of section 2-1303(c) does not give courts discretion about whether to award prejudgment interest in cases to which that section applies or the timeframe in which such interest accrues. Principally, the statute provides that in "all" actions for personal injury or wrongful death, the plaintiff "shall" recover prejudgment interest on "all" damages except those specifically delineated. It provides that prejudgment interest "shall" begin to accrue on the date the action is filed; however, for injuries or death occurring prior to the effective date of the amendment, prejudgment interest "shall" begin to accrue on the later of the date that the action is filed or the amendment's effective date (*i.e.*, July 1, 2021). It provides that the trial court, in entering judgment for the plaintiff, "shall" add interest calculated at a rate of 6% per annum on the amount of the judgment less certain specified deductions. The use of the word "shall" in a statute is generally interpreted to mean that something is mandatory. *Citizens*

*Organizing Project v. Department of Natural Resources*, 189 Ill. 2d 593, 598 (2000).

¶ 74      This interpretation is consistent with courts' interpretation of subsection (a) of the same statute, which addresses postjudgment interest. Section 2-1303(a) of the Code of Civil Procedure (735 ILCS 5/2-1303(a) (West 2022)) employs similar language that "judgments recovered in any court *shall* draw interest at the rate of 9% per annum from the date of judgment until satisfied" and that when judgment is entered, "interest *shall* be computed at the above rate." (Emphases added.) Courts have held that postjudgment interest under section 2-1303(a) is mandatory and that the legislature did not vest the trial court with discretion in the assessment of interest under section 2-1303(a). See *Longo v. Globe Auto Recycling, Inc.*, 318 Ill. App. 3d 1028, 1039 (2001).

¶ 75      As stated above, the defendants do not appear to take issue with this interpretation of the statute. Instead, they argue that prejudgment interest should be disallowed where awarding it "does not comport with justice and equity." However, the cases upon which they rely are inapposite because they involved proceedings in equity where equitable awards of prejudgment interest were sought. See *In re Estate of Wernick*, 127 Ill. 2d 61, 86-88 (1989) (equitable award of prejudgment interest was allowed in action for breach of fiduciary duty); *McKenzie Dredging Co. v. Deneen River Co.*, 249 Ill. App. 3d 694, 697-98 (1993) (equitable award of prejudgment interest was disallowed in action for accounting and damages among joint venturers). By contrast, this negligence case is an action at law wherein prejudgment interest is allowed pursuant to statute. See *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 257-58 (2006) (distinguishing prejudgment interest available in proceedings in equity and actions at law). We accordingly conclude that the plain language of the statute must control in this case, and, as explained above, the legislature has provided the courts with no discretion as to the allowance of prejudgment interest.

¶ 76      The defendants also raise various arguments that challenge the constitutionality of section 2-1303(c). We have reviewed the arguments on this issue that the defendants make in this case, and we conclude that they are no different than the constitutional challenges that have been comprehensively considered and rejected by the appellate court in multiple recent decisions. See *Cotton v. Coccaro*, 2023 IL App (1st) 220788, ¶¶ 40-70; *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643, ¶¶ 175-240; *Galich v. Advocate Health & Hospital Corp.*, 2024 IL App (1st) 230134, ¶¶ 57-85; *Bajgrowicz v. DEV Medical Associates, S.C.*, 2024 IL App (1st) 230196-U, ¶¶ 205-229; see also *Wilcox v. Advocate Condell Medical Center*, 2024 IL App (1st) 230355, ¶¶ 116-120; *Ramirez v. Carobene*, 2025 IL App (1st) 240203, ¶¶ 46-47; *Kandeel v. Advocate Health & Hospitals Corp.*, 2024 IL App (1st) 240264-U, ¶ 55. We adhere to the holding of these cases in which the constitutionality of section 2-1303(c) has been repeatedly reaffirmed as against nearly identical arguments, and we find this issue to be settled law within this district.

¶ 77                    F. Request for Relief by *Amicus Curiae*

¶ 78      During briefing, this court allowed the filing of an *amicus curiae* brief on behalf of Donald P. Eckler, who authored the column in the *Chicago Daily Law Bulletin* that discussed the defendants' then-pending posttrial motions based upon the social media posts at issue in this case. The *amicus curiae* brief that was filed does not purport to assist this court in the deciding the legal issues presented by the parties. Instead, it requests that the appellate court vacate or strike certain statements made by the trial court in its written order denying the posttrial motions. Those statements by the trial court did not mention Eckler by name. However, they indirectly imply that the defendants' attorneys had informed him of the substance of the posttrial motions and suggest that the publicity that the social media posts received in the *Chicago Daily Law Bulletin* would make it more difficult for the trial court to ensure an uncontaminated pool of potential jurors if it

ordered a retrial. See *supra* ¶ 18.

¶ 79    We agree with the plaintiffs that a request for relief of this nature is not the proper role of an *amicus curiae*, and we deny it for this reason. An *amicus curiae* is not a party to an action but rather is a "friend" of the court. *In re J.W.*, 204 Ill. 2d 50, 73 (2003). Consequently, the sole function of an *amicus* is to advise or make suggestions to the court. *Id.* An *amicus* takes the case as he finds it, with the issues framed by the parties. *Oswald v. Hamer*, 2018 IL 122203, ¶ 41. Courts need not pass on issues raised by an *amicus. People v. P.H.*, 145 Ill. 2d 209, 234 (1991).

¶ 80                                    III. CONCLUSION

¶ 81    For the foregoing reasons, we vacate the verdict and judgment entered in favor of the plaintiffs, and we remand this case for a new trial. We order the case to be reassigned to a different trial judge upon remand.

¶ 82    Reversed and remanded.

¶ 83    JUSTICE PUCINSKI, specially concurring:

¶ 84    I concur completely with this opinion. I write only to express my profound sadness that this vulnerable plaintiff will now be exposed to yet another trial because of the actions of her attorney.

---

***Kroft v. Viper Trans, Inc.*, 2025 IL App (1st) 240220**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-L-9466; the Hon. Joan E. Powell, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellants:** | J. Timothy Eaton, Jonathan B. Amarilio, and Adam W. Decker, of Taft Stettinius & Hollister LLP, of Chicago, for appellant Viper Trans, Inc.

Hugh C. Griffin, of Hall Prangle & Schoonveld, LLC, and Shimon B. Kahan, of LaBarge, Campbell, Lyon & Kahan, LLC, both of Chicago, for other appellants. |

---

| | |
|---|---|
| **Attorneys for Appellees:** | Kenneth J. Allen, Otto J. Shragal, Robert D. Brown, and Sarah M. Cafiero, of Allen Law Group, LLC, of Chesterton, IN, for appellees. |

---

| | |
|---|---|
| **Attorneys for *Amicus Curiae*:** | Stephen Novack and Andrew D. Campbell, of Armstrong Teasdale LLP, of Chicago, for *amicus curiae* Donald P. Eckler. |

---