2025 IL App (1st) 240875

FIFTH DIVISION
August 8, 2025

No. 1-24-0875

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| CHICAGO JOHN DINEEN LODGE No. 7, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| THE CITY OF CHICAGO; THE DEPARTMENT OF | ) | No. 24 CH 00093 |
| POLICE; BRANDON JOHNSON, in His Official | ) | |
| Capacity as Mayor; LARRY SNELLING, in His Official | ) | The Honorable |
| Capacity as Superintendent of the Chicago Police | ) | Michael T. Mullen, |
| Department; and THE CHICAGO CITY COUNCIL, | ) | Judge, Presiding. |
| | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Presiding Justice Mikva concurred in the judgment and opinion.
Justice Mitchell concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Following interest arbitration proceedings after an impasse in collective bargaining

negotiations before the Dispute Resolution Board (DRB), Chicago John Dineen Lodge #7 (the

Lodge) filed a petition to confirm and enforce final and binding arbitration awards in the circuit

court of Cook County. The City of Chicago, Department of Police, Brandon Johnson in his official capacity as Mayor (Mayor), Larry Snelling in his official capacity as Superintendent of the Chicago Police Department (Superintendent), and the Chicago City Council (City Council) (collectively the City), filed a counterclaim to reject the arbitration award. The parties then filed cross motions for summary judgment, while the Lodge additionally filed a section 2-619.1 (735 ILCS 5/2-619.1 (West 2022)) motion that the City's counterclaim was untimely.

¶ 2     The circuit court issued a memorandum opinion and order, which denied the Lodge's section 2-619.1 motion, finding that the City's counterclaim arose under section 14(k) of the Illinois Public Labor Relations Act (Public Labor Act) (5 ILCS 315/14(k) (West 2022)) rather than section 12(b) of the Uniform Arbitration Act (710 ILCS 5/12(b) (West 2022)). The court further concluded that several portions of the arbitrator's award were neither arbitrary nor capricious. However, the circuit court concluded that the arbitrator's decision to require private arbitration was contrary to public policy and that the decision to require that officers facing serious discipline should remain on pay status was arbitrary and capricious.

¶ 3     The Lodge appeals, contending that the circuit court (1) failed to give proper deference to the arbitration award and impermissibly rejected contract interpretations and factual findings made by the arbitrator; (2) misapplied the public policy exception to the presumption of validity for arbitration awards in vacating the arbitrator's finding that private arbitrations for serious disciplinary matters was required; (3) ignored the arbitrator's factual findings with respect to the status quo of the pay status for offers subject to suspensions over one year or discharge and the arbitrator's application of the presumption of innocence; and (4) erred in finding that the City's counterclaim was timely. The Lodge also contends that it was entitled to attorney fees under section 14(k) of the Public Labor Act (5 ILCS 315/14(k) (West 2022)).

This court held oral arguments on this matter on June 17, 2025. For the following reasons, we affirm in part and reverse in part.

¶ 4                                                                    I. BACKGROUND

¶ 5        The factual background comes from the circuit court's memorandum opinion and order entered on March 21, 2024.

¶ 6                                      A. The Collective Bargaining History Between the Parties

¶ 7        The Lodge is the exclusive collective bargaining representative for Chicago Police officers below the rank of Sergeant. A summary of the bargaining history is fully set forth in the arbitrator's Supplemental Interim Opinion and Award, dated August 2, 2023; in the Final Opinion and Award, dated October 19, 2023; and in the Supplemental Final Opinion and Award, dated January 4, 2024. We will only reference information that is relevant to the determination of this appeal.

¶ 8        The Lodge and the City have been engaged in formal collective bargaining since 1981. Since 1981, the Lodge and the City have negotiated 12 collective bargaining agreements. Relevant to this appeal, the City and the Lodge were parties to a collective bargaining agreement (CBA) originally in effect from July 1, 2012, to June 30, 2017.

¶ 9        The Superintendent of Police does not have the authority to discharge or separate a non-probationary Chicago Police Department (CPD) officer. This was reflected in section 8.8 of the 2012-2017 CBA, which provided that the Superintendent's authority was capped at suspending an officer up to 365 days. Additionally, this is reflected in both a City ordinance and the Illinois Municipal Code, which provide that the authority to discharge or suspend an officer for more than 365 days is reserved for the Chicago Police Board (Police Board). See 65 ILCS 5/10-1-18.1 (West 2022); Chicago Municipal Code § 2-84-030 (amended Nov. 17,

2021). The Police Board is an independent civilian body that provides oversight of the Chicago Police Department. The Police Board's nine members are all Chicago residents who were nominated by the Community Commission for Public Safety and Accountability, appointed by the Mayor and approved by the City Council.

¶ 10    Section 8.8 of the 2012-2017 CBA also provided that officers facing serious discipline were suspended without pay pending separation. Any such suspension was subject to review by a Police Board hearing officer within seven days of the notice of suspension. See Police Board Rules, § IV(D). All other City CBAs allow for arbitration or Human Resources Board hearings as an appeal from dismissal; however, none of the CBAs permit an employee to remain in paid status pending a hearing or arbitration.

¶ 11                    B. The City's Consent Decree

¶ 12    On August 29, 2017, the State of Illinois filed a lawsuit in the United States District Court for the Northern District of Illinois (District Court) against the City under several statutes and constitutional provisions seeking to enjoin the CPD from engaging in a repeated pattern of using excessive force, including deadly force, and other misconduct that disproportionately harmed Chicago's African American and Latino residents. On January 31, 2019, the District Court issued a Memorandum and Opinion approving a final Consent Decree between the State of Illinois and the City in which it stated that the decree aimed to ensure that the critically important job of policing in Chicago was done fairly, transparently, and without bias, affording dignity to those who were served and protected and providing proper guidance, training, and support for the women and men who comprised the police force.

¶ 13    The Consent Decree identified "accountability and transparency" as key principles in its process for holding officers accountable for misconduct. Among other things, the Consent

Decree required the City to establish criteria for the selection of Police Board members and to ensure that the Police Board members and hearing officers received training on topics including constitutional law, police tactics, investigations of police conduct, impartial policing, policing individuals in crisis, CPD policies, procedures, and disciplinary rules, procedural justice, and community outreach.

¶ 14                    C. The Successor Agreement to the 2012-2017 CBA

¶ 15        In October 2017, the City and the Lodge began negotiations over a successor agreement to the 2012-2017 CBA. In the initial phase of negotiations, completed in July 2021, the parties reached an agreement on various terms for a successor agreement, including the time period of the agreement (July 1, 2017, through June 30, 2025); a 20% base salary increase; a duty availability allowance; a uniform allowance; health care commitments and contribution increases; salary cap increases; prescription drug deductible modifications; retiree health insurance contributions; and police accountability provisions. Those terms were ratified by the City Council on September 14, 2021.

¶ 16        After completion of the first phase of negotiation, the parties continued to negotiate over numerous unresolved issues. The parties exchanged proposals in late 2021 and participated in six formal bargaining sessions in February, May, June, July, and November 2022. After reaching an impasse, the Lodge and the City engaged in seven mediation sessions in August, September, and October 2022. Despite the negotiations and mediation sessions, the parties were unable to resolve many of the remaining disputed issues.

¶ 17                                D. Impasse Arbitration

¶ 18        Under Section 28.3(B) of the 2012-2017 CBA, if the parties were unable to reach complete agreement on terms of a successor agreement, the disputed issues are referred to a three-person

Dispute Resolution Board (DRB), consisting of one member selected by each of the parties and a third member to be jointly selected by the parties, with the third member serving as the Neutral Chair. This provision essentially encompassed impasse interest arbitration as provided for in the Public Labor Act. See 5 ILCS 315/1 *et seq.* (West 2022). A DRB was established to address the issues remaining unresolved between the City and the Lodge after their negotiations and mediation sessions stalled.

¶ 19    In September 2022, the Neutral Chair was appointed pursuant to procedures established by the American Arbitration Association (AAA). After meeting with the parties, the Neutral Chair issued a scheduling order that formalized the process for proceedings so that any remaining matters in dispute between the parties could be addressed. The order also set deadlines for the submission of evidence and pre-hearing and responsive briefs, the potential for mediation, and the identification of issues that the Neutral Chair deemed necessary to be heard in any hearing. The process was to be completed by April 20, 2023.

¶ 20    The City identified 15 issues and the Lodge identified 17, with over 50 sub-issues to be resolved. Both sides also submitted their final offers. The Lodge's final offer on December 16, 2022, proposed that the separation of an officer from service should be subject to grievance arbitration. The Lodge also proposed that officers would not be subject to suspension without pay pending dismissal.

¶ 21    In its December 16, 2022, final offer and response to the Lodge's request for arbitration of dismissal cases, the City proposed that cases of dismissal or suspensions in excess of 365 days would continue to be heard by the Police Board in the first instance, but if a Police Board decision resulted in the separation or suspension in excess of 365 days, the Lodge would then be entitled to invoke grievance arbitration challenging the suspension or separation under

Article 9 of the Agreement. The City also proposed that the arbitrator should be a resident of Cook County and have completed the same training as required for members of the Police Board under the Consent Decree. Further, the City proposed that the arbitration hearings should be open to the public in the same manner as hearings before a hearing officer employed by the Police Board. The City further proposed that the arbitrator should be supplied with the complete record of the Police Board hearing process and that the arbitrator should give deference to the findings of the Police Board. However, the arbitrator could not overrule the Police Board's findings unless the Lodge demonstrated by clear and convincing evidence that the findings were erroneous with respect to an issue of fact or the existence of cause for separation.

¶ 22                                  E. Interim Arbitration Opinion and Award

¶ 23        On June 26, 2023, the Neutral Chair issued a 74-page Interim Opinion and Award that accepted the Lodge's proposal in its entirety, specifically allowing CPD officers the option of having their grievances regarding separations and suspensions in excess of one year to be decided by an arbitrator in the first instance rather than by the Police Board. In accordance with the Interim Opinion and Award, on July 13 and 14, 2023, the Lodge and the City submitted their proposed language for the CBA regarding the arbitration of serious discipline.

¶ 24        In response, the City modified its prior proposal by dropping the requirement that separations and suspensions in excess of one year first be heard by the Police Board; however, the City's proposal preserved the existing practice of the Superintendent filing charges for suspension in excess of 365 days or separation. In such cases, an officer would not receive pay once the written charges were filed, in accordance with the existing rules, subject to review by a Police Board hearing.

¶ 25        The City further proposed that the arbitrator be a resident of Illinois and have completed the same training (or certify that he or she had read the City's training materials) required for members of the Police Board pursuant to Paragraphs 540-543 of the Consent Decree. The City also proposed that the arbitration hearing be open to the public in the same manner as hearings before the Police Board. Additionally, the City proposed that its suggested procedure would apply only in those instances where written charges were filed by the Superintendent on or after the date of ratification of the Successor CBA.

¶ 26        In contrast, the Lodge proposed that arbitration proceedings for separation or suspensions exceeding 365 days be private and not open to the public. The Lodge further proposed that the award should apply retroactively to any case filed after August 1, 2021, that had not proceeded to a full evidentiary hearing.

¶ 27        The Neutral Chair subsequently requested that the parties submit comments on each other's proposals. In the City's comments, the City noted that the Lodge's proposal that an officer subject to discharge remain in pay status pending an arbitration hearing was unprecedented and at odds with how challenges to discharges were handled under the City's 43 collective bargaining agreements with other unions. The City further maintained that retroactive application of the arbitration option would be unworkable and that no consideration of the professional responsibility of arbitrators mandated that discharge hearings should be closed to the public.

¶ 28        On August 2, 2023, the Neutral Chair issued a 52-page Supplemental Interim Opinion and Award. With respect to the arbitration of grievances protesting separations and suspensions in excess of 365 days, the Neutral Chair found that the proposals from both the Lodge and the

City were so unreasonable that the "selection of the more reasonable offer was not possible, thus again forcing a formulation of the language by [the] Board."

¶ 29    In formulating such language, the Neutral Chair rejected the City's proposals that the arbitration option include maintenance of the long-established practice that officers confronting the prospect of separation do not remain on pay status (subject to review by a Police Board hearing officer); that the arbitration hearing be open to the public; that the arbitrator be provided with the same training materials required of Police Board members; and that the arbitration option apply prospectively. The Neutral Chair deemed the City's proposal facially unreasonable, finding that the City sought to "maintain crucial elements of the Police Board process."

¶ 30    The Neutral Chair further determined that the City's proposal that arbitration hearings in cases involving serious discipline cases be open to the public was contrary to the law, as arbitration was inherently private. In support of that finding, the Neutral Chair referenced the rules of the AAA and the Code of Professional Responsibility for Arbitrators of Labor-Management Disputes of the National Academy of Arbitrators.[1] The Neutral Chair did not address whether there was a public interest in transparency and accountability in cases involving serious discipline of sworn police officers. Further, the Neutral Chair did not identify problems of any kind resulting from the lengthy history of Police Board hearings being open to the public.

¶ 31    In the August 2, 2023, Supplemental Interim Opinion and Award, the Neutral Chair concluded that the arbitration option for serious disciplines would be retroactive to September

---

[1]The circuit court noted that those rules were promulgated by private bodies that apply only to arbitrators and private parties that agree to follow them.

14, 2022, which was the date of his appointment as Neutral Chair. Despite not finding that the City had stalled the interest arbitration proceedings, the Neutral Chair nevertheless concluded that not awarding retroactivity on this issue would have a chilling effect on collective bargaining by encouraging one party to delay the outcome.

¶ 32 On October 19, 2023, the Neutral Chair issued a Final Opinion and Award incorporating the prior tentative agreements between the parties and the Interim and Supplemental Interim Opinions and Awards regarding procedures for grievance arbitration of serious police discipline. The City dissented from that award. On December 13, 2023, the City Council ratified by ordinance all the remaining terms resolved through negotiation, mediation, and impasse arbitration proceedings, with the exception of the grievance arbitration option for police officer discipline cases involving separation or suspensions in excess of 365 days. As to those provisions, the City Council expressly rejected the contract language included in the Neutral Chair's award. The City Council also rejected the provision that officers facing serious discipline would remain in pay status during their disciplinary proceedings.

¶ 33 The City and the Lodge understood and agreed that if the City Council rejected the arbitration terms included in the October 19, 2023, Final Opinion and Award, the matter would be returned to the DRB for further consideration and issuance of a supplemental award. This understanding was also reflected in the October 19, 2023, award itself. In accordance with the parties' agreement, the terms rejected by the City Council were referred back to the DRB to discuss the concerns of the City Council that led to its rejection and to determine whether modifications to the contract could be made. The DRB subsequently met on December 21, 2023, and on January 4, 2024, the Neutral Chair issued a 64-page Supplemental Final Order and Award, restating the previous terms included in the Final Award from October 2023. The

City Council subsequently rejected the Supplemental Final Awad on February 15, 2024, by a vote of 32-18.

¶ 34                    F. The Circuit Court's Judicial Review of the Arbitration Award

¶ 35        As noted above, on January 4, 2024, the Lodge filed a petition to confirm the arbitration award in the circuit court of Cook County and the City filed a counterclaim on February 23, 2025, with leave of court. The Lodge subsequently filed a combined section 2-619.1 (735 ILCS 5/2-619.1 (West 2022)) motion based on sections 2-615 (*id.* § 2-615) and 2-619(a)(5) (*id.* § 2-619(a)(5)) to dismiss the City's counterclaim as untimely because it was filed more than 90 days after issuance of the Neutral Chair's October 19, 2023, Final Order.

¶ 36        The circuit court rejected the Lodge's section 2-619.1 motion in its entirety. First, the court rejected the section 2-615 portion of the motion on the basis that it could not determine that the City violated the applicable statute of limitations based on the well-pled facts in its counterclaim. With respect to the section 2-619(a)(5) portion of the motion, the court noted that the Lodge argued that the City's counterclaim was based on section 12(b) of the Uniform Arbitration Act (710 ILCS 5/12(b) (West 2022)). However, the court found that the City's counterclaim actually arose under section 14(k) of the Public Labor Act (5 ILCS 315/14(k) (West 2022)), which specifies that the deadline to file such petition runs from the date of the issuance of the arbitration order that became the subject of further interest arbitration proceedings. The circuit court found that it was undisputed that the City's counterclaim was filed within 90 days of the supplemental final award, which became the final award, and thus denied the Lodge's section 2-619(a)(5) portion of the motion.

¶ 37        The circuit court further found that the Neutral Chair's decisions to allow the Lodge the option of having an arbitrator or the Police Board for serious disciplinary cases and to require

that any arbitration proceed in a private forum were neither arbitrary nor capricious, finding that the conclusions were thorough and considered. The court further found that the decision to allow an officer to elect either arbitration or a Police Board hearing was not against public policy and granted the Lodge's request to confirm that part of the award. The circuit court also found that the Neutral Chair's retroactivity ruling and the rejection of arbitrator training were neither arbitrary nor capricious and granted the Lodge's request to confirm those parts of the award.

¶ 38    However, although the circuit court concluded that the Neutral Chair's decision to require private arbitration was not arbitrary or capricious, the court found that it was contrary to public policy. The circuit court determined that, with respect to the award's restriction on public access to arbitrations of serious police disciplinary cases, there was a well-defined and dominant public policy that existed. The court based this conclusion in part on the January 2019 Consent Decree between the City of Chicago and the State of Illinois that was the result of an investigation initiated by the United States Department of Justice as noted above. The stated goals of the Consent Decree were to address and reform "critical deficiencies at the CPD, including departmental policies and practices, such as the use of force, accountability, training, community policing and engagement, supervision and promotion, transparency and data collection and officer assistance and support." Pursuant to the Consent Decree, the City was required to increase and promote transparency in matters of police accountability. The circuit court found that this was clear evidence of the public policy in this State—the goal of having an open and transparent government—and that accountability and transparency were clearly identified in the Consent Decree, which evidences the State's determination to ensure that police discipline cannot occur in a private forum. The court specifically found it clear that

accountability and transparency, as it related to the CPD, was a well-defined and dominant public policy of the State of Illinois and pointed to specific paragraphs contained in the Consent Decree to support its finding.

¶ 39    The court further found that the State has legislatively demonstrated the importance of transparency regarding the affairs of government through its Freedom of Information Act (FOIA). 5 ILCS 140/1 *et seq.* (West 2022). FOIA explicitly states in section (1) that

"[i]t is declared to be the public policy of the State of Illinois that all persons are entitled to full and complete information regarding the affairs of government and the official acts and policies of those who represent them as public officials and public employees consistent with the terms of this Act. Such access is necessary to enable the people to fulfill their duties of discussing public issues fully and freely, making informed political judgments and monitoring government to ensure that it is being conducted in the public interest." 5 ILCS 140/1 (West 2022).

¶ 40    The circuit court noted that nothing in the Public Labor Act or any other provision of applicable law mandated reversal of the longstanding practice of hearings in serious police disciplinary cases being open to the public. The court further noted that it was well known that many members of the community were deeply and unfortunately suspicious of police and the process by which the CPD seeks to hold officers accountable for serious misconduct; as such, there was a paramount public interest and need for the transparency of the more serious disciplinary cases. Additionally, the circuit court noted that it was significant that there was no legally mandated presumption of privacy in arbitration, finding that the standards relied on by the Neutral Chair were rules set in place by private bodies and that private parties in those instances chose to avail themselves of those rules. The court ultimately denied the Lodge's

request to confirm that portion of the award and granted the City's request to vacate that portion of the award.

¶ 41    With respect to the Neutral Chair's decision to require pay pending dismissal or suspensions of more than 365 days, the circuit court found that it was arbitrary and capricious. The court noted that, for the entirety of the City's more than 40-year collective bargaining history with the Lodge, the City has always had the authority to suspend an officer without pay pending dismissal or suspension in excess of 365 days, subject to the officer's right to challenge the suspension through a preliminary hearing before the Police Board.

¶ 42    The court found that the present system struck an appropriate balance between protecting officers from unfair suspension and the City's interest in not having to continue paying an officer during a period when it could not send the officer out on emergency calls. The court questioned the Neutral Chair's conclusion that officers should be entitled to remain in pay status pending serious discipline because there was no "rational basis" to distinguish between cases involving suspensions of up to 365 days and suspensions of 366 days or more. The court found that there was a clear and rational basis for the current practice; in a suspension case, the employer implicitly agrees that the officer is potentially deserving of reinstatement at some point in time. In a case involving separation, that employee is no longer a police officer. An officer who is acquitted and reinstated after a hearing can be made whole through back pay and monetary relief, but if the City prevailed at the disciplinary hearing, there was no mechanism that would allow the City to recover wages paid to the employee while the dismissal case was pending.

¶ 43    The court distinguished the Neutral Chair's reliance on the bedrock presumption that "a defendant was innocent until proven guilty," noting that it was a constitutional protection that

only applied in criminal proceeding and the suspension or termination of employment was not a criminal proceeding. The circuit court concluded that the Neutral Chair's decision that the constitutional notion of innocent until proven guilty, without a finding that the current policy implicated the officers' due process rights, required upending the balance that the City and the Lodge had maintained for the past 40 years. The court found that this ran directly contrary to the fundamental principles that the Neutral Chair was required to follow when issuing his award. The court further concluded that the right to arbitration did not imply the existence of a statutory right to remain on the payroll during the discharge proceeding, as evidenced by the fact that no other city employee accused of dischargeable conduct had a right to suspension with pay pending arbitration, and the Neutral Chair did not identify any rational basis to radically depart from, instead of preserving, the status quo on that issue. The circuit court found that this decision was arbitrary and capricious and denied the Lodge's request to confirm that portion of the award.

¶ 44    The circuit court further found that the City's request for a declaratory judgment did not have a proper basis because the doctrine of nonliability for past conduct bars such a request and that it was an arbitrable issue that should be necessarily decided in an arbitration proceeding. The court denied the City's motion for summary judgment on that issue and granted the Lodge's cross-motion for summary judgment on that issue.

¶ 45    Finally, the circuit court denied the Lodge's request for attorney fees, noting that its argument was not well-developed and that while the court had both agreed and disagreed with the City's analysis of certain issues, it did not mean that the City was without a proper basis to pursue the litigation. The court found that the City had a clear and good faith basis to address

the underlying awards in the manner that it did and, based on the court's conclusions, both parties could be considered prevailing parties.

¶ 46 The circuit court's order was entered on March 21, 2024, and the Lodge filed its timely notice of appeal on April 19, 2024.

¶ 47 During briefing, this court allowed the filing of *amicus curiae* briefs in support of the City. The Illinois Attorney General's *amicus curiae* brief asserted that this court should affirm the circuit court's rejection of the arbitration award as to serious CPD disciplinary matters because public transparency was a cornerstone goal of the Consent Decree, including in police disciplinary matters and eliminating public access to hearings would undermine both the Consent Decree's reforms and public confidence in CPD. The *amicus curiae* brief of Academics and Policy Groups for Police Accountability also asserted that the circuit court correctly concluded that the State of Illinois has a well-defined and dominant public policy requiring transparency and accountability related to police disciplinary matters and further that private arbitration proceedings would undermine that public policy. The *amicus curiae* brief of Organizations and Community Leaders that Represent Victims and Survivors of Chicago Police Misconduct echoed the sentiments of the other briefs regarding the well-defined and dominant public policy of accountability and transparency and discussed well-known examples of serious police misconduct. The Lodge filed a motion to strike the *amicus curiae* briefs, which is taken with the case.

¶ 48                                                   II. ANALYSIS

¶ 49 While the Lodge divides its issues into several separate contentions as noted above, they amount to the following: (1) whether the City's counterclaim was untimely; (2) whether the circuit court misapplied the public policy exception to the presumption of validity for labor

arbitration awards by ignoring statutory and constitutional statements of public policy and asserting its own unsupported notions of public policy instead; specifically, that FOIA does not create a well-defined public policy, nor was the consent decree a well-defined public policy; (3) whether the circuit court erred by vacating the DRB's decision to require pay pending a hearing on an officer's dismissal, as the DRB's decision was neither arbitrary nor capricious, essentially ignoring the DRB's factual findings with respect to the status quo of the pay status for officers subject to disciplinary adjudications and rejecting the DRB's factual findings on the past practice of the presumption of innocence; and (4) whether plaintiff is entitled to attorney fees under section 14(k) of the Public Labor Act(5 ILCS 315/14(k) (West 2022)). We will also address the Lodge's motion to strike the *amicus curiae* briefs of the Illinois Attorney General, community organizations, and academics that were filed in support of the City, which was taken with the case.

¶ 50                      A. Motion to Strike *Amicus Curiae* Briefs

¶ 51       The Lodge filed a motion in this court to strike the *amicus curiae* briefs that were filed by the Illinois Attorney General, a group of organizations and community leaders that represent victims and survivors of Chicago police misconduct, and a group of academics and policy groups for police accountability on the grounds that the briefs advance arguments that were not raised by any party in this litigation and improperly rely on matters outside the record on appeal.

¶ 52       An *amicus curiae* is not a party to an action but rather is a "friend" of the court. *Kroft v. Viper Trans, Inc.*, 2025 IL App (1st) 240220, ¶ 79. Consequently, the sole function of an *amicus* is to advise or make suggestions to the court. *Id.* An *amicus* takes the case as he finds it, with the issues framed by the parties. *Id.*

¶ 53    A review of the *amicus curiae* briefs filed in this case indicate that they addressed the matter currently before this court—namely, whether the arbitrator's decision was arbitrary and capricious and the application of the public policy exception. Therefore, the *amicus curiae* briefs properly advise this court as "friends" of the court. See *Independent Trust Corp. v. Kansas Bankers Surety Co.*, 2016 IL App (1st) 143161, ¶ 35. Accordingly, the *amicus curiae* briefs should not be stricken, where they do not interfere with or preclude appellate review.

¶ 54                                B. Standard of Review

¶ 55                                1. Summary Judgment

¶ 56    This matter was before the circuit court on the parties' cross motions for summary judgment. Summary judgment is appropriate when the pleadings, depositions, admissions, and affidavits demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2022); *City of Chicago v. Fraternal Order of Police*, 399 Ill. App. 3d 707, 711 (2010). In ruling on a motion for summary judgment, the trial court must view all evidence in the light most favorable to the nonmovant. *State Police v. Fraternal Order of Police Troopers Lodge No. 41*, 323 Ill. App. 3d 322, 326 (2001). We review an order granting summary judgment *de novo*. *City of Chicago*, 399 Ill. App. 3d at 711.

¶ 57                                2. Review of Arbitration Awards

¶ 58    In order to review the circuit court's determinations regarding the parties' cross motions for summary judgment, we must look at the underlying arbitration award. For clarity's sake, this case involves statutory impasse interest arbitration involving a public entity employer and public employees who are not allowed to strike. See 5 ILCS 315/2 (West 2022). Interest arbitration involves settling the terms of a contract being negotiated between the parties;

especially in labor law, it involves arbitration of a dispute concerning what provisions will be included in a new collective bargaining agreement. *Glass v. Department of Corrections*, 2022 IL App (4th) 210740, ¶ 33 (sub-definition of "interest arbitration" under the definition of "arbitration" (citing Black's Law Dictionary (11th ed. 2019))).

¶ 59 The object of arbitration is to avoid the formalities, delay, and expenses of litigation in court. Limited judicial review fosters the long accepted and encouraged principle that an arbitration award should be the end, not the beginning, of litigation. *Town of Cicero v. Illinois Ass'n of Firefighters, IAFF Local 717 AFL-CIO, CLC*, 338 Ill. App. 3d 364, 371 (2003). Thus, whenever possible, a court must construe an award so as to uphold its validity. *Id.* at 372. Additionally, in determining whether grounds exist to vacate an arbitration award, judicial review generally extends only to those areas expressly stated by statute. *Id.*

¶ 60 Judicial review of an arbitrator's award is extremely limited. *Forest Preserve District v. Illinois Fraternal Order of Police Labor Council*, 2017 IL App (1st) 161499, ¶ 19. Under this limited review, we must enforce a labor-arbitration award if the arbitrator acts within the scope of his or her authority and the award draws its essence from the parties' collective-bargaining agreement. *Id.* Whether an arbitrator's decision fails to draw its essence from the collective bargaining agreement is a question of law, which we review *de novo. Id.* However, arbitration in a collective bargaining situation is a unique type of arbitration, and special rules apply. *County of Tazewell v. Illinois Fraternal Order of Police Labor Council*, 2015 IL App (3d) 140369, ¶ 12.

¶ 61 An arbitration award draws its essence from the collective bargaining agreement when the arbitrator, in making a decision, limits himself or herself to interpreting and applying the agreement. *Forest Preserve District*, 2017 IL App (1st) 161499, ¶ 20. An arbitrator may not

change or alter the terms of the collective bargaining agreement or dispense his or her own brand of "industrial justice." (Internal quotation marks omitted.) *Id.* Although an arbitrator may look to many sources for guidance, should the award be based on a body of thought, feeling, policy, or law outside of the collective bargaining agreement, it will be set aside as not rationally derived from the essence of the agreement. *Id.*

¶ 62     Generally, the grounds for vacating an arbitration award are listed in section 12(a) of the Uniform Arbitration Act (Act). 710 ILCS 5/12(a) (West 2022). However, in collective bargaining cases, courts have applied the standards that existed for vacating an agreement at common law. *Village of Posen v. Illinois Fraternal Order of Police Labor Council*, 2015 IL App (1st) 133329, ¶ 36; 710 ILCS 5/12(e) (West 2022). Where, as here, the arbitration involved collective bargaining, a court will disturb the arbitration award only on the common-law grounds like fraud, corruption, partiality, misconduct, mistake, or failure to submit the question to arbitration. *Chicago Transit Authority v. Amalgamated Transit Union Local 308*, 2018 IL App (1st) 170702, ¶ 16.

¶ 63                                C. Interest Arbitration Provisions

¶ 64     The Public Labor Act regulates labor relations between public employers and employees. Section 2 of the Public Labor Act provides:

"It is the public policy of the State of Illinois that where the right of employees to strike is prohibited by law, it is necessary to afford an alternate, expeditious, equitable and effective procedure for the resolution of the labor disputes subject to approval procedures mandated by this Act. To that end, the provisions for such awards shall be liberally construed." 5 ILCS 315/2 (West 2022).

- 20 -

¶ 65    To that end, the legislature has empowered such employees through interest arbitration, found in section 14 of the Public Labor Act. See § 14. Interest arbitration addresses "unresolved disputes concerning wages, hours, terms and conditions of employment." *Id*. § 14(p); *Glass* , 2022 IL App (4th) 210740, ¶ 51.

¶ 66    Section 14(k) of the Public Labor Act provides for the judicial review of interest arbitration orders:

> "Orders of the arbitration panel shall be reviewable, upon appropriate petition by either the public employer or the exclusive bargaining representative, by the circuit court for the county in which the dispute arose or in which a majority of the affected employees reside, but only for reasons that the arbitration panel was without or exceeded its statutory authority; the order is arbitrary, or capricious; or the order was procured by fraud, collusion or other similar and unlawful means. Such petitions for review must be filed with the appropriate circuit court within 90 days following the issuance of the arbitration order." 5 ILCS 315/14(k) (West 2022).

¶ 67    Our supreme court has held that agency action is arbitrary and capricious if the agency (1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Town of Cicero*, 338 Ill. App. 3d at 372 (citing *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 505-06 (1988)). The standard is one of rationality. *Greer*, 122 Ill. 2d at 506.

¶ 68    Section 14(h) of the Public Labor Act lists eight factors to be considered by the arbitrator as applicable in interest arbitration. Those factors are:

"(1) The lawful authority of the employer.

(2) Stipulation of the parties.

(3) The interests and welfare of the public and the financial ability of the unit of government to meet those costs.

(4) Comparison of the wages, hours and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours and conditions of employment of other employees performing similar services and with other employees generally:

      (A) In public employment in comparable communities.

      (B) In private employment in comparable communities.

(5) The average consumer prices for goods and services, commonly known as the cost of living.

(6) The overall compensation presently received by the employees, including direct wage compensation, vacations, holidays and other excused time, insurance and pensions, medical and hospitalization benefits, the continuity and stability of employment and all other benefits received.

(7) Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings.

(8) Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment during voluntary collective bargaining, mediation, fact-finding, arbitration or otherwise between the parties, in the public service or in private employment." 5 ILCS 315/14(h) (West 2022).

¶ 69                    D. Whether the Arbitrator's Decision Violated Public Policy

¶ 70        We first determine whether the arbitrator's decision that private arbitration hearings for serious police misconduct proceedings violated public policy as the circuit court found.

¶ 71                                1. Public Policy Exception

¶ 72        Courts have crafted a public policy exception to vacating arbitration awards, which otherwise draw their essence from a collective bargaining agreement. *Decatur Police Benevolent & Protective Ass'n Labor Committee v. City of Decatur*, 2012 IL App (4th) 110764, ¶ 22. The public policy must be well defined and dominant and determined by reference to the laws and legal precedents and not from general considerations of supposed public interests. *Id.* ¶ 23. Such vacatur is rooted in the common law doctrine that a court may refuse to enforce contracts that violate law or public policy. *Illinois State Police*, 323 Ill. App. 3d at 328.

¶ 73        Public policy is the legal principle that no one may lawfully do that which has the tendency to injure the welfare of the public. *Jordan v. Knafel*, 355 Ill. App. 3d 534, 539 (2005). Thus, agreements are not void as against public policy unless they are clearly contrary to what the constitution, the statutes, or the decisions of the courts have declared to be the public policy or unless they are manifestly injurious to the public welfare. *Id.*

¶ 74        The public policy exception is a narrow one that should only be invoked when a party clearly shows enforcement of the contract, as interpreted by the arbitrator, contravenes some explicit public policy. *Decatur Police Benevolent & Protective Ass'n*, 2012 IL App (4th) 110764, ¶ 23. The application of the public policy exception requires a two-step analysis. First, we must determine whether a well-defined and dominant public policy can be identified. *County of De Witt v. American Federation of State, County & Municipal Employees, Council*

*31*, 298 Ill. App. 3d 634, 637 (1998). If so, we must then determine whether the arbitrator's award, as reflected in his interpretation of the Agreement, violated the public policy. *Id.*

¶ 75    Questions of public policy are left to the courts, not the arbitrators. *Id.* at 638. A reviewing court is not bound by the arbitrator's consideration of public policy, and we may not abdicate our responsibility to the arbitrator to protect the public interest at stake. *Id.* at 639. Further, we may affirm the circuit court for any reason or ground appearing in the record, regardless of whether the particular reasons given by the circuit court or its specific findings are correct or sound. *Akemann v. Quinn*, 2014 IL App (4th) 130867, ¶ 21.

¶ 76                                2. Discussion

¶ 77    The Neutral Chair's decision accepted the Lodge's proposal in its entirety, which provided the Lodge with the option of having grievances protesting separations and suspensions in excess of one year to be decided by an arbitrator rather than by the Police Board. The Neutral Chair rejected the City's proposal that such arbitration hearing be open to the public in the same manner as Police Board hearings. As noted above, the Neutral Chair further determined that the City's proposal that arbitration hearings in cases involving suspension and separations in excess of 365 days be open to the public was contrary to the law, as arbitration was inherently private. In support of that finding, the Neutral Chair referenced the rules of the AAA and the Code of Professional Responsibility for Arbitrators of Labor-Management Disputes of the National Academy of Arbitrators. The Neutral Chair did not address whether there was a public interest in transparency and accountability in cases involving serious discipline of sworn police officers. Further, the Neutral Chair did not identify problems of any kind resulting from the lengthy history of Police Board hearings being open to the public.

¶ 78      A cursory examination of the arbitration award's allowance of private grievance arbitrations in matters of serious police misconduct implicates several unquestionably well-defined and dominant public policies established by statute and case law—namely, effective law enforcement and the exposure of crime to protect the citizens of this State, as well as police accountability and transparency. Arbitration awards that are contrary to state public policy are void and not enforceable. *City of Chicago v. Fraternal Order of Police, Chicago Lodge No. 7*, 2020 IL 124831, ¶ 44.

¶ 79      The public policy favoring effective law enforcement can be found in the Civil Administrative Code of Illinois (20 ILCS 2605/2605-200(a)(3) (West 2022)), the Citizen Participation Act (735 ILCS 110/5 (West 2022)), and the Illinois Uniform Conviction Information Act (20 ILCS 2635/2(B) (West 2022)). This policy has also been previously identified by this court in a number of cases. See, *e.g.*, *City of Springfield v. Police Protective & Benevolent Ass'n Unit No. 5*, 2023 IL App (4th) 220321-U, ¶ 16;[2] *State Police v. Fraternal Order of Police Troopers Lodge*, 323 Ill. App. 3d 322, 329 (2001); *Davenport v. Board of Fire & Police Commissioners*, 2 Ill. App. 3d 864, 869 (1972). Inherent in effective law enforcement is the public policy favoring the exposure of crime. *Illinois State Police*, 323 Ill. App. 3d at 329.

¶ 80      Additionally, our supreme court has also recognized a clear public policy favoring the investigation and prosecution of criminal offenses. See *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 132-33 (1981); see also *Leweling v. Schnadig Corp.*, 276 Ill. App. 3d 890,

---

[2]Unpublished appellate dispositions filed under Illinois Supreme Court Rule 23(b) (eff. Feb. 1, 2023) on or after January 1, 2021, may be cited for persuasive purposes.

896-97 (1995) (public policy favors the exposure of criminal activity). This public policy is well-defined to protect the citizens of this State.

¶ 81        The public policy favoring police accountability and transparency, as noted by the circuit court, has its roots in FOIA, which specifically states that all persons are entitled to full and complete information regarding the affairs of government and the official acts and policies of those who represent them as public officials and employees. 5 ILCS 140/1 (West 2022); *City of Chicago v. Fraternal Order of Police*, 2019 IL App (1st) 172907, ¶ 31. Further, the General Assembly declared that "it is the public policy of the State of Illinois that access by all persons to public records promotes the transparency and accountability of public bodies at all levels of government," and that "it is a fundamental obligation of government to operate openly." (Internal quotation marks omitted.) *City of Chicago*, 2019 IL App (1st) 172907, ¶ 31. It is clear that it was the intention of the General Assembly to promote transparency in government. Further, public policy in favor of such transparency was demonstrated by the adoption of the consent decree between the state and the City, which specifically stated that it aimed to ensure that the critically important job of policing in Chicago was done fairly, transparently, and without bias, affording dignity to those who were served and protected and providing proper guidance, training, and support for the women and men who comprised the police force.

¶ 82        Additionally, it bears mentioning that the City and CPD have maintained a decades-old policy of having hearings for serious misconduct open to the public. While there is no specific public policy that requires all police misconduct hearings to be open to the public, we find that to suddenly shut the door after 60 years of open hearings severely undermines the public policies discussed above. We note that during oral argument, the Lodge conceded that records of what occurred at a private grievance arbitration for serious disciplinary matters would never

be available to the public, even after the fact. Instead, the public would only know what the charges were and what the result was. We find that changing the 60-year policy at this juncture in favor of shrouding the proceedings in secrecy is counter to the public policy of transparency and accountability.

¶ 83    We therefore conclude that the public policy of police transparency and accountability is a well-defined public policy codified by statute, contrary to the Lodge's assertion, and applies here.

¶ 84    The second step is to determine whether the arbitrator's award violated those identified public policies in requiring private grievance arbitration for serious police misconduct, and it is clear that it did. In this case, the arbitrator's award regarding private grievance arbitration was based on the arbitrator's reliance on arbitration rules governing private arbitrations that are not applicable to public government employees. There was no consideration of effective law enforcement or the policy of public accountability and transparency in the arbitrator's award. There was no consideration of the 60-year policy of open hearings for serious police misconduct. More importantly, there was no finding that such open hearings violated the officers' due process or otherwise negatively impacted the officers. Law enforcement is charged with the duty of exposing crime, not concealing it. When public policy is at issue, it is the court's responsibility to protect the public interest at stake. *American Federation of State County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 333 (1996) (*AFSCME II*). We find that the portion of the arbitration award requiring closed door arbitrations for serious police misconduct violates public policy.

¶ 85    Accordingly, we find that the arbitrator's determination that closed arbitration hearings for serious police misconduct violates the well-defined and dominant public policies of effective

law enforcement, the exposure of crime to protect the citizens of this State, and police accountability and transparency. As such, we conclude that the circuit court did not err in granting the City's motion for summary judgment on this issue.

¶ 86          E. Officers Remaining in Pay Status Pending Serious Disciplinary Proceedings

¶ 87     We next review the Lodge's contention that the circuit court erred in finding that the portion of the arbitrator's award that allowed officers to remain in pay status pending serious disciplinary proceedings was arbitrary and capricious.

¶ 88     As noted above, section 14(k) of the Public Labor Act provides for the judicial review of interest arbitration orders when the arbitration panel was without or exceeded its statutory authority; the order is arbitrary or capricious; or the order was procured by fraud, collusion, or other similar and unlawful means. 5 ILCS 315/14(k) (West 2022). Our supreme court has held that agency action is arbitrary or capricious if the agency (1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Greer*, 122 Ill. 2d at 505-06; *Town of Cicero*, 338 Ill. App. 3d at 372. The standard is one of rationality. *Greer*, 122 Ill. 2d at 505-06; *Town of Cicero*, 338 Ill. App. 3d at 372.

¶ 89     Because the object of arbitration is to avoid the formalities, delay, and expenses of litigation in court, judicial review of an arbitration decision is highly deferential. *Seither & Cherry Co. v. Illinois Bank Building Corp.*, 95 Ill. App. 3d 191, 195 (1981). Thus, whenever possible, a court must construe an award so as to uphold its validity. *Garver v. Ferguson*, 76

Ill. 2d 1, 10 (1979). That a court might have decided the issue differently does not make an arbitrator's award arbitrary or capricious. *Town of Cicero*, 338 Ill. 3d at 376.

¶ 90 As noted by the circuit court, none of the City's 43 collective bargaining agreements with unions allow an employee facing discharge for serious misconduct to remain on payroll. As the circuit court noted, the arbitrator's reliance on tenets of criminal law were misplaced as a discharge or suspension from employment is not akin to a criminal proceeding where an individual's fundamental liberty interest is at stake. Nor did the arbitrator's award discuss how an employee's due process rights were violated or how the City could recoup the paid out funds if the employee was subsequently discharged as a result of the proceedings. Further, the arbitrator's award did not provide a basis for overturning the decades-long practice of treating officers facing an extended period of suspension or discharge differently than officers facing short term suspension or minor discipline.

¶ 91 Nevertheless, although we disagree with the arbitrator's reasoning and would have decided the issue differently, we must conclude that the arbitrator's award was not arbitrary or capricious because it did not rely on factors unintended by the legislature; did not entirely fail to consider an important aspect of the problem; nor was it implausible or counter to the evidence, despite none of the City's other collective bargaining agreements having this provision. Accordingly, we must reverse the circuit court's grant of summary judgment as to this portion of the award.

¶ 92                    F. The Lodge's Request for Attorney Fees

¶ 93 Finally, the Lodge sought attorney fees under section 14(k) of the Public Labor Act (5 ILCS 315/14(k) (West 2022)), which was denied by the circuit court.

¶ 94    Generally, a trial court has broad discretionary powers in awarding attorney fees. *Kirk v. Arnold*, 2020 IL App (1st) 190782, ¶ 12. However, when the question on appeal is whether the trial court properly applied the law when it denied a request for attorney fees, this presents a question of law that we review *de novo*. *Id.*

¶ 95    Our review of the circuit court's denial of attorney fees begins with an interpretation of the statute that provides the basis for fee-shifting in this case (*id.* ¶ 13), which is section 14(k) of the Public Labor Act as noted above. The fundamental principle of statutory construction is to ascertain and give effect to the legislature's intent. *Id.* The statutory language, given its plain and ordinary meaning, is the best indication of that legislative intent. *Id.*

¶ 96    The statute at issue provides, in pertinent part, that "[t]he party against whom the final decision of any such court shall be adverse, if such court finds such appeal or petition to be frivolous, shall pay reasonable attorneys' fees and costs to the successful party as determined by said court in its discretion." 5 ILCS 315/14(k) (West 2022). According to the plain language of the statute, attorney fees are to only be awarded against the losing party if the court finds such appeal or petition to be frivolous.

¶ 97    On review of the circuit court's memorandum opinion, there was no such finding. In fact, the circuit court made a contrary determination by concluding that while it had both agreed and disagreed with the City's analysis of certain issues, it did not mean that the City was without a proper basis to pursue the litigation. The court found it to be clear that the City had a clear and good faith basis to address the underlying awards in the manner that it did and based on the court's conclusions, both parties could be considered prevailing parties. Our review of the circuit court's determination yields the same result. As the Lodge has failed to

establish that the circuit court found the City's petition to be frivolous or decided that the Lodge was the prevailing party, we affirm the circuit court's denial of attorney fees to the Lodge.

¶ 98                                    III. CONCLUSION

¶ 99        For the foregoing reasons, we affirm the circuit court's entry of summary judgment in favor of the City, regarding the portion of the arbitrator's award that ordered private arbitration for serious police misconduct hearings, as against public policy. We also affirm the circuit court's determination that the City's counterclaim was not untimely filed and the denial of the Lodge's request for attorney fees. However, we reverse the circuit court's determination that officers facing serious discipline should not remain in pay status because the arbitrator's award was not arbitrary or capricious.

¶ 100       Affirmed in part and reversed in part.

¶ 101       JUSTICE MITCHELL, concurring in part and dissenting in part:

¶ 102       In light of the impassioned political arguments raised by the City of Chicago and its *amici*, it is worth reiterating what this case is *not* about. It is *not* about the relative merit of open, public disciplinary proceedings for police. That public policy question properly belongs to the political branches of government, not well-intentioned judges. Indeed, when sister states decided to mandate public disciplinary proceedings, they did so not by judicial fiat but through legislation. See, *e.g.*, Tex. Loc. Gov't Code Ann. § 143.010(c) (West 2022) ("Each [police and fire fighter commission] proceeding shall be held in public."); *id.* § 143.003(1); Fla. Stat. § 286.011(1) (West 2022) ("All meetings of any board *** are declared to be public meetings open to the public at all times ***."); 1978 Fla. Att'y Gen. Op. No. AGO 078-105, at 2 ("[P]olice complaint review boards *** are within the purview of and required to comply with the provisions of *** s. 286.011 ***."). There is no statute in Illinois even remotely equivalent.

Illinois public policy makers have been *silent* on the question, and in practice, police disciplinary proceedings have been handled for generations in private arbitration in jurisdictions across Illinois, consistent with state labor law.

In affirming the circuit court's decision to partially vacate an arbitrator's decision on public policy grounds, the majority has exceeded the traditionally very narrow boundaries that govern the judicial review of labor arbitration decisions. And in the process, the majority severely undermines a deeply entrenched public policy in Illinois favoring collective bargaining agreements and enforcement of labor arbitration awards: "It is the public policy of the State of Illinois to grant public employees full freedom of association, self-organization, and designation of representatives of their own choosing for the purpose of negotiating wages, hours and other conditions of employment or other mutual aid or protection." 5 ILCS 315/2 (West 2022). In approving the Senate bill that would become the Public Labor Relations Act, Governor James R. Thompson declared collective bargaining a "fundamental right." 1983 Ill. Laws 6462, Governor's Message, at ____.

¶ 103        At its core, the *legal* question presented in this appeal is about deference—deference that judges owe to arbitrators acting within the confines of their authority and the interest arbitration process defined in the parties' collective bargaining agreement. Our Illinois Supreme Court has instructed that "[a] labor arbitration award must be enforced if the arbitrator acts within the scope of his authority and his award draws essence from the parties' collective-bargaining agreement." *American Federation of State, County & Municipal Employees, AFL-CIO v. State of Illinois*, 124 Ill. 2d 246, 254 (1988) (*AFSCME I*). This rule is consistent with United States Supreme Court precedent that articulates the same principle:

"The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government ***. *** [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers International Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37-38 (1987).

¶ 104    While Illinois and federal law recognize that a court may refuse to enforce an arbitration award that violates public policy, this exception is "extremely limited." *AFSCME I*, 124 Ill. 2d at 254. The Illinois Supreme Court has cautioned that "in order to vacate an arbitral award upon these grounds, the contract, *as interpreted* by the arbitrator, must violate some explicit public policy." (Emphasis in original.) *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 307 (1996) (*AFSCME II*). Further, the public policy "must be 'well-defined and dominant' and ascertainable 'by reference to the laws and legal precedents and not from generalized considerations of supposed public interests.' " *Id.* (quoting *W.R. Grace & Co. v. Local Union No. 759*, 461 U.S. 757, 766 (1983)). To ensure that a judge is not merely giving voice to her personal preference, the law requires a clear, explicit, well-defined, and dominant expression of public policy found in positive law before a court can properly invoke the public policy exception.

¶ 105    Here there is no expression of well-defined and dominant public policy in Illinois that precludes hearing police disciplinary cases in private arbitration. No statute speaks to it. No constitutional provision prohibits it. No judicial decision forbids it. How could there be such a

public policy? Again, in jurisdictions across Illinois and the country, police disciplinary cases have been handled in private labor arbitration. It is difficult to imagine that the General Assembly would allow such a practice to persist if it actually offended the public policy of the state.

¶ 106    The circuit court rested its conclusion to the contrary on a consent decree between the City of Chicago and the United States Department of Justice. But a consent decree is nothing more than a settlement agreement; it is not a judicial determination. No published decision in America has ever found a consent decree to be a source of public policy. More significantly, there is nothing in the consent decree that mandates that police disciplinary proceedings be open to the public, and it expressly provides that nothing in the consent decree alters the City's collective bargaining agreement with the police.

¶ 107    Additionally, the circuit court cited the Illinois Freedom of Information Act and its precatory language referencing "transparency." 5 ILCS 140/1 (West 2022). But that statute expressly exempts employee disciplinary matters from disclosure. *Id.* § 7(n). Again, there is no provision in the FOIA law that mandates public disciplinary proceedings for police. Hortatory but vague references to "transparency" and "accountability" are precisely the generalized considerations that fail to establish an explicit, well-defined, and dominant public policy.

¶ 108    Now the City contends that a public policy can be derived from the parties' past practice of allowing more serious police disciplinary cases to go before the Police Board in a public forum. But that was by *consent*: there was no legislative or judicial expression of public policy that required a public proceeding. To be sure, a prior course of dealing between the parties to a contract can be an interpretative device that informs the parties' intent (E. Allan Farnsworth, Contracts

§ 7.13, at 528 (2d ed. 1990)), but it does not create public policy. No court in America has ever before found a well-defined and dominant public policy from the parties' past practice. Moreover, the City made this course of dealing argument to the arbitrator, an expert in labor law and the parties' prior agreements. Even if the arbitrator made a mistake of law, it is his interpretation of the contract—not ours—that must control. See, *e.g.*, *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960) ("It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.").

¶ 109    For these reasons, I would reverse the circuit court judgment setting aside that portion of the arbitrator's decision on public policy grounds. To conclude otherwise invites parties to relitigate every labor arbitrator's decision under the guise of public policy. That is repugnant to the explicit, well-defined, and dominant public policy in favor of collective bargaining and the arbitration process that goes with it. I do agree with the majority that the circuit court erred in setting aside the arbitrator's decision to allow officers to remain in pay status pending disciplinary proceedings, and I concur in that portion of the judgment.

***Chicago John Dineen Lodge No. 7 v. City of Chicago*, 2025 IL App (1st) 240875**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 24-CH-00093; the Hon. Michael T. Mullen, Judge, presiding. |
| **Attorneys for Appellant:** | Joel A. D'Alba, Matt Pierce, and Joe Weishampel, of Asher, Gittler & D'Alba, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Mary B. Richardson-Lowry, Corporation Counsel, of Chicago (Myriam Zreczny Kasper, Suzanne M. Loose, and Aya R. Barnea, Assistant Corporation Counsel, of counsel), for appellees. |
| *Amicus Curiae*: | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Alex Hemmer and R. Sam Horan, Assistant Attorneys General, of counsel), *amicus curiae*. |
| | Craig B. Futterman and Benjamin Postone (law student), of Mandel Legal Aid Clinic at the University of Chicago Law School, of Chicago, for *amici curiae* Organizations and Community Leaders that Represent Victims and Survivors of Chicago Police Conduct. |
| | Loren V. Jones, of Impact for Equity, and Sharon Fairley, both of Chicago, and David Melton, of Evanston, for *amicus curiae* for Academics and Policy Groups for Police Accountability. |